**UNIVERSAL TOWING COMPANY, Appellant, Cross-Appellee,**

v.

**UNITED BARGE COMPANY, Appellee, Cross-Appellant.**

**Nos. 77–1688, 77–1701.**

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1978.

Decided June 26, 1978.

---

P. Terence Crebs of Gallop, Johnson, Godiner, Morganstern & Crebs, St. Louis, Mo., for appellant; D. Sherman Cox, St. Louis, Mo., on brief.

Edwin D. Akers, Jr., Thompson & Mitchell, St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and MacLAUGHLIN, District Judge.*

* The Honorable Harry H. MacLaughlin, United States District Judge, District of Minnesota, sitting by designation.

GIBSON, Chief Judge.

These consolidated actions involve a dispute over the use and operation of a barge fleeting site located in the Mississippi River near St. Louis. Universal Towing Company (Universal) instituted one suit in the Missouri state courts to have its written contract with United Barge Company (United) declared void. Universal brought the other case, also in the state court, to recover for fleeting services it provided for United. United counterclaimed in both actions for rent under the contract and for expenses it incurred in removing two sunken barges. The cases were removed to federal court because of Universal's claim that the contract was invalid under federal antitrust law. The District Court[1] ruled that the contract was valid, that Universal was entitled to $87,714.18 for services rendered, that United was entitled to $100,800 for rent, and that United was entitled to $100,000 for the cost of removing one of the two sunken barges. Both parties have appealed. We affirm in part and reverse in part.

United is a contract barge carrier on the inland waterways. It is primarily engaged in transporting coal from St. Louis and other points to Dairyland Power Corporation in Wisconsin and carrying grain southward on the return trip. As part of its operation, United needs barge fleeting services in the St. Louis harbor. Barge fleeting involves preparing groups of barges for towing. Fleeting delays are serious because they result in towboats standing idle between trips.

In order to cut its turn-around time, United leased the Venice Fleet Site from Union Electric in 1969. Twin City Barge & Towing Company operated the site for United until December 16, 1970. Prior to that date, Universal tentatively agreed to assume operation and responsibility for the Venice Fleet Site and to perform United's fleeting and harbor services. Universal was already in the business of providing fleeting, mooring and harbor services in the St. Louis harbor.

During the early part of 1971, Universal provided services for United. Also at that time, a survey of the Venice site was performed; it revealed that one of the two fleeting barges had sunk and that the other was taking on water and required periodic pumping. On August 1, 1971, United and Universal signed the Fleet Operation Agreement involved in this appeal. It provided that Universal would lease the fleeting site for three years on a year-to-year basis with either party having the right to terminate with nine months notice prior to any August 1. The written agreement did not require United to use any specific quantity of fleeting services. However, it is clear that the agreement was based on United requiring substantial fleeting services and those services being supplied by Universal.

Shortly after the agreement was signed, the second barge sank. Universal claims that it has at no time used the fleet site for mooring and fleeting services. It has refused to pay any rent. The record includes evidence that Universal may have made use of the site on one or two occasions. During the remainder of the 1971 navigation season, Universal provided the St. Louis fleeting services needed by United. Beginning in 1972, United called on Universal to perform very limited services. This diminution in business[2] resulted from coal being loaded in Paducah, Kentucky, rather than St. Louis, and from United entering into a reciprocal towing agreement with Peavey Grain Company.

As of the spring of 1972, United knew that Universal denied any responsibility for removal of either barge. After several delays, United entered into an agreement dated July 17, 1976, for the removal of both barges. Under that contract, the lower barge was to be removed at a cost of $30,000 and the upper barge removal cost was

1. The Honorable H. Kenneth Wangelin, United States District Judge, Eastern District of Missouri. The District Court decision is reported at 435 F.Supp. 81 (1977).

2. One witness testified that United's business decreased 90% in 1972 from the 1971 level. In 1971 Universal received $113,000 from United for fleeting and harbor services.

$145,000. Scrap value reduced the net cost of removing both barges to approximately $150,000. The continuing dispute over rent due and the barge removal cost resulted in this litigation.[3] The numerous questions presented can be classified as follows: (1) Did the sinking of the barges render the contract unenforceable? (2) Was the contract unenforceable under the antitrust laws? (3) Did the change in the quantity of work United supplied to Universal act to terminate the contract in 1972? and (4) Did the court err in assessing damages for the cost of raising the second barge?

In challenging the enforceability of the contract due to the condition of the fleeting site, Universal contends that the 1971 agreement was silent or ambiguous on the issue of Universal accepting the site "as is." The agreement incorporated portions of the 1969 lease by reference. Among the portions so incorporated was paragraph 10, which provided in part: "Lessee accepts the premises in their present condition * *." It is obvious that the contract was not silent on the issue. Universal also argues that the contract was ambiguous. This argument is based on the fact that "lessee" is not defined in the 1971 agreement but is defined to mean United in unincorporated portions of the 1969 lease. In addition, it is contended that Universal only accepted "responsibility" for paragraph 10 of the 1969 lease and that this referred only to prospective burdens or duties, not present conditions.

■ In reviewing the District Court's conclusion that the contract was unambiguous, we apply familiar principles of law. The disputed language is to be examined in the context of the entire agreement. It is ambiguous if reasonably susceptible of more than one construction. *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 386–87

(8th Cir. 1969). The words of the contract are to be given their plain and ordinary meaning as understood by a reasonable, average person. *In re SEC v. White & Co., Inc.*, 546 F.2d 789, 792 (8th Cir. 1976).

■ Applying those principles here, we are satisfied that no ambiguity exists and Universal did accept the site "as is." The word "lessee" is, in the context of this agreement, clearly referring to Universal. The 1971 agreement is in many respects a sub-lease of the property involved in the 1969 lease. When portions of the earlier lease are incorporated by reference in a sub-lease the reasonable interpretation is that the terms "lessee" and "lessor" refer to the parties to the sub-lease. Universal strenuously contends that United agreed to repair the fleet site and place it in a usable condition, even to the extent necessary to satisfy Universal. The written agreement is silent on this point except as to the "as is" reference.[4]

The other alleged ambiguity involves the word "responsible." The 1971 agreement provides that "Universal assumes full responsibility for the provisions of Paragraphs 9, 10 * * *" of the 1969 lease. Universal contends that this provision only obligated it to meet prospective burdens and duties. We cannot accept that contention as a reasonable construction. Other portions of the 1969 lease that were incorporated in the 1971 agreement provide that Universal would maintain the property. Maintenance is clearly a duty or burden and thus a responsibility under Universal's theory. However, if the acceptance of the property in its present condition is not binding on Universal, then much of the agreement becomes meaningless. We are satisfied that the District Court was correct in rejecting the strained argument that the agreement was ambiguous. The incorpo-

3. On this appeal, there has been no dispute over United's liability for the cost of fleeting services it received from Universal. The parties stipulated at trial that United owed $87,-714.18 to Universal for mooring, fleeting and harbor services.

4. It is difficult, even with hindsight, to perceive why the parties, particularly Universal, would sign a written agreement with all of these apparent difficulties on the use, repair and operation of the fleet site unresolved. However, our task is to interpret the agreement in light of the conditions under which the agreement was formulated and signed.

rated portions of the 1969 lease must be viewed as a whole and are fully applicable to the parties. Universal accepted the property as it existed on August 1, 1971.

■ Universal presses a related contention that United breached a warranty that the site be fit for use as a maritime facility. The District Court found that no warranties of fitness were made by United and no representations concerning the condition of the fleet site were made to induce Universal's agreement. Although there is evidence to support Universal's position, the evidence is conflicting and we cannot say the District Court's factual finding on this issue is clearly erroneous. Furthermore, it is clear that no express warranty was made in the 1971 agreement.

We also conclude that the District Court's finding that the fleet site was in usable condition on August 1, 1971, is not clearly erroneous. This finding, coupled with Universal's knowledge that one barge had sunk and the other was taking on water and required periodic pumping, defeats Universal's attempted reliance on an implied warranty.

Universal also appeals from the District Court's holding that the claim that the contract violated the antitrust laws is totally frivolous. The District Court ruled: "No evidence was presented to make a case under either *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), or *Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co.*, 184 F.2d 552 (4th Cir. 1950)."

■ On appeal, Universal only pursues its claim under § 1 of the Sherman Act, 15 U.S.C. § 1, as interpreted by *Pennsylvania Water & Power*. It is contended that the 1971 agreement included an unlawful price-fixing agreement because Universal and United are allegedly potential competitors and the agreement provided that they would agree to reasonable charges to be required of all persons using the fleet site. While we doubt that the facts establish a Sherman Act violation, we need not reach

that question because the asserted defense is not permitted in this case. *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

In *Kelly*, the Supreme Court considered the attempt of a vendee of onions to avoid paying for them because of an alleged Sherman Act violation. The Court affirmed judgment for the vendor and stated the limits of the defense of illegality.

In any event, an analysis of the narrow scope in which the defense is allowed in respect of the Sherman Act indicates that the principle of distinction is not what the petitioner claims it to be. The leading case here in which the defense was allowed is *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227 [29 S.Ct. 280, 53 L.Ed. 486] much relied on by petitioner. There the Voight company had made purchases from Continental, a corporation which existed only as a selling agent for numerous wallpaper companies doing business as a pool and selling at prices, alleged to be excessive and unreasonable, fixed through the pool agreement. The Court was of opinion that to give judgment for the excessive purchase price so fixed in favor of such a vendor would be to make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act. 212 U.S., at 261, 29 S.Ct. 280. Any thought that the Court might have been proceeding on broader grounds was shortly afterwards laid to rest by the unanimous opinion of the Court in the *Wilder* case. 236 U.S. [165] at 177, [35 S.Ct. 398, 59 L.Ed. 520.] The scope of the defense of illegality under the Sherman Act goes no further. While enforcement of a contract between wrongdoers may more frequently present such a situation, cf. *Lyons v. Westinghouse Electric Corp.*, 2 Cir., 222 F.2d 184, 188, the character of the parties is not in itself determinative. Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, "of preventing people

from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co., supra*, at 271 (dissenting opinion). Supplying a sanction for the violation of the Act, not in terms provided and capricious in its operation, cf. *Bruce's Juices, Inc., v. American Can Co., supra* [330 U.S. 743] at 753–754 [67 S.Ct. 1015, 91 L.Ed. 1219], is avoided by treating the defense as so confined.

358 U.S. at 520–21, 79 S.Ct. at 432.

It is clear in this case that a judgment in favor of United for rent due does not involve the courts in carrying out "restraints forbidden by the Sherman Act." In light of *Kelly*, Universal's antitrust defense is frivolous. *See also Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 390 (8th Cir. 1969).

Having concluded that the 1971 agreement was enforceable when executed, we reach the troublesome question of the length of the period during which Universal was obligated to pay rent. Some additional facts are necessary to focus on this issue. They reveal that, in retrospect, the Venice Fleet Site has been a business disaster.

After United leased the site in 1969, Twin City Barge & Towing Company operated it. Twin City received United's business as well as some other fleeting work. However, for various reasons including the formation of a sandbar across the site, Twin City suffered substantial losses. It left the site in 1970 while negotiations were taking place between Universal and United.

The written agreement between Universal and United did not include any provision on the amount of business United would give to Universal. Despite this, it is not denied that the agreement would not have been signed had the parties not agreed that Universal would do United's fleeting work. It is apparent that Universal had little need for an additional fleeting site. It agreed to take on the burdens of the Venice Fleet Site because of the expected additional work for United.

During the 1971 navigation season that expectation was fulfilled. However, as previously noted, United's requirements drastically diminished in 1972 and later years. This was due in part to a reciprocal towing agreement between United and the Peavey Grain Company. Although performing work for United, the Peavey Grain Company did not have its fleeting performed by Universal. The District Court found: "Defendant gave plaintiff all of its harbor and fleeting business as required by the contract." Universal contends that this finding was clearly erroneous. United denies that it is clearly erroneous and urges that in any event the written agreement did not place any such obligation on United.

■ We first reject the contention that silence in the written agreement relieved United from its obligation to have Universal provide fleeting services. This promise was the inducement and practical consideration for Universal's acceptance of the 1971 agreement. Without United's work there was no chance for successful operation of the fleeting site. The evidence fully supports the finding that United agreed to give all of its harbor and fleeting business to Universal.

■ The District Court apparently concluded that the reciprocal towing agreement with Peavey Grain Company excused United from giving Universal the portion of its business done by Peavey. We conclude that this was error. The existence of inconsistent contract obligations is no excuse for failure to abide by the agreement with Universal. 17 Am.Jur.2d, *Contracts* § 400 (1964). *See Swiss-American Importing Co. v. Variety Food Products Co.*, 436 S.W.2d 770 (Mo.App.1968); *LaClede Power Co. v. Stillwell*, 97 Mo.App. 258, 71 S.W. 380 (1902). Universal is not obligated for rent under the agreement beyond the end of the first one-year term.

This result is consistent with the written agreement. It provided that either party could terminate the contract by giving notice nine months in advance of August 1. Universal apparently did not give notice because it contended the agreement was unenforceable. Even if it had given notice when it learned that United was not going

to give it the expected volume of business, the notice would not have been effective until two years of the three-year agreement had expired. The unilateral actions of United that denied Universal the benefit of its bargain will not be permitted to enrich United after it ceased to provide substantial fleeting business to Universal.

██ Finally, we turn to the issue of damages for the cost of raising the second sunken barge. Universal is, of course, only responsible for raising the barge that sank after it accepted the property on August 1, 1971. Although United knew in 1971 that Universal denied responsibility for raising the barge, it was not raised until 1976. During this time the cost increased due to silting and inflation. In view of our holding that the contract terminated in 1972, we affirm the District Court's decision to reduce United's recovery by an amount representing the increased cost due to delay. As noted in *Transport Manufacturing & Equipment Co. v. Fruehauf Trailer Co.*, 295 F.2d 223, 232 (8th Cir. 1961), "[t]he duty of an injured party to use reasonable diligence to minimize damages is recognized generally as well as in Missouri."

Universal contends that the damages determination was clearly erroneous. The evidence was in conflict on the question of the cost of removing the sunken barge at various points in time. In addition, the value of scrap metal varied. After considering the record and the arguments of the parties, we are satisfied that the District Court was not in clear error when it determined Universal was liable for $100,000 in connection with the raising of the second barge.

In conclusion, we affirm the District Court's ruling that the 1971 agreement is valid. Universal is entitled to $87,714.18 for fleeting services rendered. United is entitled to rent for the period of August 1, 1971, to July 31, 1972, in the amount of $33,600. United is further entitled to $100,000 for Universal's liability toward the cost of removing the second barge.

Costs are to be assessed 65% against Universal and 35% against United.