**MEDTRONIC, INC., Plaintiff,**

v.

**CATALYST RESEARCH CORPORATION, Defendant.**

**No. 4–77–Civ. 201.**

United States District Court, D. Minnesota, Fourth Division.

July 6, 1981.

Robert O. Vidas, Schroeder, Siegfried, Ryan, Vidas, Steffey & Arrett, Lawrence C. Brown, Faegre & Benson, Minneapolis, Minn., for plaintiff.

Peter Dorsey, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., Berj A. Terzian, Pennie & Edmonds, New York City, for defendant.

## MEMORANDUM ORDER

LARSON, Senior District Judge.

The continuing battle over production rights to the lithium-iodine battery—a significant development in the cardiac pacemaker industry—is once again before the Court. The plaintiff in this lawsuit, Medtronic, seeks in this motion a preliminary injunction enjoining defendant Catalyst Re-

search Corporation ("CRC") from instituting or prosecuting any action that would enjoin Medtronic from manufacturing lithium-iodine batteries or selling pacemakers which contain the batteries. The motion is based on an alleged breach of a written agreement between the parties which allegedly bars CRC from interfering with Medtronic's production of the battery. This written agreement ("Agreement") is the basis for Count III of the amended complaint which was added along with other allegations when the Magistrate granted Medtronic's motion to amend the complaint. That Order has been appealed by CRC and is also before the Court. The primary issue, however, that the Court is now being asked to resolve concerns the proper interpretation of the Agreement.

Medtronic initially filed this lawsuit against CRC and its parent company, Mine Safety Appliances Co., seeking a declaratory judgment that two patents held by CRC[1] on the lithium-iodine battery are invalid and that Medtronic's use of the battery has not been infringing. CRC then counterclaimed alleging patent infringement. Mine Safety Appliances Co. was dismissed as a defendant by this Court in 1979. Meanwhile, on May 2, 1980, CRC filed a patent infringement action in Canada against Medtronic's Canadian subsidiary alleging infringement of CRC's Canadian patents that are the equivalent of CRC's United States patents at issue in this case. A similar lawsuit was filed in the Federal Republic of Germany against Medtronic's German subsidiary, Medtronic GmbH, on December 10, 1980. Like the Canadian case, the German action involves CRC's German patents on the lithium-iodine battery. A final hearing in the German infringement proceeding was scheduled for June 30, 1981, in Dusseldorf. CRC requests injunctive relief in both the Canadian and German lawsuits.[2] On May 7, 1981, the Magistrate granted Medtronic's motion to amend the complaint to allege that title to the disputed patents is vested in the United States because the inventions resulted from classified government research, that CRC failed to disclose this government research in its patent application, and that a Retroactive Foreign Filing License for the patents that was recently issued was improper. Medtronic was also permitted to add a breach of contract cause of action that is based on the Agreement.

I. THE AGREEMENT

The parties in this lawsuit have a long history of doing business with each other. Much of that history is recounted in the Court's earlier memorandum issued in this case. *See Medtronic, Inc. v. Mine Safety Appliances Company and Catalyst Research Corporation*, 468 F.Supp. 1132 (D.Minn. 1979). Of particular relevance here are negotiations concerning the lithium-iodine battery which commenced in early 1976: Dissatisfied with the lithium-iodine batteries it was purchasing and convinced that the battery was a significant development, Medtronic sought to obtain the technology necessary to manufacture the batteries itself. On March 16, 1976, Medtronic achieved this objective by entering into an agreement with Wilson Greatbatch, Ltd. ("WGL") under which WGL would transfer certain technology and patent interests to Medtronic. WGL was a licensee of CRC[3] and although WGL agreed to transfer to Medtronic some rights that it owned exclusively, some of the material was believed to be proprietary information owned by CRC and licensed to WGL.[4] Consequently, CRC

1. The patents in dispute include: United States Letters Patent No. 3,660,163 for "Solid State Lithium-Iodine Primary Battery" (the Moser Patent) and No. 3,674,562 for "Primary Cells and Iodine Containing Cathodes Therefor" (the Schneider Patent).

2. Medtronic alleges that CRC is also planning a similar lawsuit in Japan.

3. WGL had been licensed to manufacture lithium-iodine batteries by patent holder CRC since February 1970.

4. In the six years that WGL had produced batteries under its CRC license, the various rights to information and technology owned by CRC and to that owned by WGL had become extensively intertwined. At this time the parameters of ownership are difficult to discern.

objected to the WGL/Medtronic proposed transfer and threatened to bring legal action against the two parties if confidential, licensed information was revealed. Despite WGL's assurances that no such material would be disclosed, CRC demanded the right to review all material in advance. WGL had no right to sub-license the information, and CRC was certain that WGL could not possibly provide Medtronic with lithium-iodine battery technology and not disclose licensed information. The proposed reviewal right was apparently unworkable. Faced with the possibility of legal action, WGL seriously considered not going ahead with its technology transfer to Medtronic. By this time, Medtronic had undertaken significant preparation for the manufacture of the lithium-iodine battery including the construction of facilities and the training of personnel. Medtronic believed that in-house manufacture of lithium-iodine batteries was essential if it was to retain its market share in the developing pacemaker industry.

Faced with the probability of a serious delay in the commencement of its battery manufacturing operation, Medtronic began negotiating with CRC to avert the threat of legal action. Negotiations culminated in a written agreement executed on June 25, 1976, under which CRC agreed not to restrain the WGL technology transfer or Medtronic's use of the information in return for a Medtronic payment of $250,000. The relevant provisions of the Agreement include:

1. CRC hereby agrees that it will not directly or indirectly seek to (a) restrain WGL from transferring any information to Medtronic, or (b) restrain or in any way prevent, try to prevent or in any way interfere with Medtronic receiving and using any and all information, including any information whether received by WGL pursuant to the February, 1970 Agreement or otherwise, included or to be included in the Agreement between Medtronic and WGL.

2. In consideration of the payment made in paragraph 3 of this Agreement, CRC agrees to and does hereby grant to WGL and Medtronic a complete release and immunity from suit for any and all claims in law or in equity for damages, profits or any injunctive relief or relief of any kind resulting from the transfer by WGL and the receipt and use by Medtronic of the WGL technical information and patent rights relating to solid state power sources transferred to Medtronic.

\* \* \* \* \* \*

6. Nothing herein shall be construed to grant Medtronic a license in or to any patent or other information of CRC or to obligate CRC to provide Medtronic with information other than that transferred or to be transferred by WGL.

Subsequently, CRC and Medtronic began intermittent negotiations that would have given Medtronic a patent license under the two patents at issue in this case. Although the parties exchanged proposals for a number of months, they do not appear to have been close to achieving agreement. Negotiations ended when Medtronic filed this lawsuit. Medtronic has been manufacturing lithium-iodine batteries since its production facilities became operational in 1976.

## II. LEAVE TO AMEND COMPLAINT

The liberal amendment policy of Rule 15(a) of the Federal Rules of Civil Procedure has long been a familiar precept of the law. Interpreting the rule in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court noted that:

Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; that this mandate is to be heeded .... If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded the opportunity to test his claims on the merits.

*Id.* at 182, 83 S.Ct. at 230. In reviewing the Magistrate's Order on appeal, the Court must determine whether the Magistrate abused his discretion in granting leave to amend the complaint. *Norbeck v. Davenport Community School Dist.*, 545 F.2d 63, 70 (8th Cir. 1976), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977).

CRC appears to argue that when a motion to amend a complaint is challenged on its merits, it must be tested by the standard normally applied to a motion to dismiss. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Eighth Circuit, however, recently reiterated its view that amendments should be denied on the merits of the claim *only* if they assert clearly frivolous claims. *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 695 (8th Cir. 1981). The Magistrate applied this standard and found that he could not say at this stage that the additional claims were clearly frivolous. CRC's claim that an incorrect standard was applied lacks merit.

CRC also asserts that it will suffer actual prejudice if the Order is permitted to stand. The Court, however, is of the view that the Magistrate's Order separating the breach of contract count for later trial adequately protects CRC from any prejudice that it may perceive. Having reviewed the allegations sought to be amended to the complaint and the applicable standards, the Court finds that the Magistrate did not abuse his discretion in granting Medtronic leave to amend its complaint.

III. PRELIMINARY INJUNCTION

In determining whether a preliminary injunction should issue, the Court must consider (1) the threat of irreparable harm to the moving party, (2) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties, (3) the probability that the movant will succeed on the merits of the claim, and (4) the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). *Dataphase Systems* makes it clear that the Court's approach in considering these factors must be a flexible one and that no single factor can or should be determinative. *Id.* Particularly when adjudging the likelihood that the moving party will ultimately prevail, mathematical precision need not be achieved. Rather, this probability factor must simply be considered in the context of the equities otherwise present under the circumstances of the case. *Id.* "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

The Court will examine first the probability that plaintiffs will prevail on Count III at trial. Despite the specialized subject matter of the original complaint, the allegations in Count III of the amended complaint merely state a cause of action for breach of contract and do not involve patent law issues. Thus, it is with the familiar principles of contract law in mind that the Court will conduct its inquiry.

Even though contracting parties may dispute the effect of their written agreement, it is fundamental that if the writing is clear and definite, the intent of the parties must be discerned solely from the terms of the contract. In such instances, a court must give effect to the language and may not apply any rules of interpretation. *H. K. Porter Co. v. Wire Rope Corp. of America, Inc.*, 367 F.2d 653, 660 (8th Cir. 1966). In other instances, however, the writing, often the product of compromise, is less clear, and a court must look elsewhere to determine the intent of the parties. A contract is ambiguous if it is reasonably susceptible of more than one construction. *Universal Towing Co. v. United Barge Co.*, 579 F.2d 1098, 1101 (8th Cir. 1978). *See also Champale, Inc. v. Joseph S. Pickett & Sons, Inc.*, 599 F.2d 857, 859 (8th Cir. 1979). When determining whether a writing is ambiguous, it is proper to "examine the disputed language in the context of the entire agreement." *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 387 (8th Cir. 1969). *See also Framlau Corp. v. United States*, 568 F.2d 687, 692 (Ct.Cl.1977). Prior negotiations are also relevant considerations in determining whether the language is ambiguous. *Sun Oil*, 414 F.2d at 387. Of course, the Court is mindful of the admonition that a court cannot create an ambiguity in an otherwise unambiguous document in order to alter its terms. *See Verlo v. Equitable Life Assurance Society of United States*, 562 F.2d 1034, 1036 (8th Cir. 1977).

With these principles in mind, the Court entertains serious doubt whether the intent of the parties can be adequately determined from the June 25, 1976 Agreement itself. Upon reading the contract, at least three reasonable constructions immediately come to mind. Paragraph One suggests that CRC has barred itself only from interfering with Medtronic's *use* of the transferred information—which possibly could mean that injunctive relief is barred—and has impliedly left open the issue of seeking damages for possible patent infringement. Paragraph Two, however, suggests that CRC has released Medtronic from *any* liability relating to the use of the material that was transferred. Presumably this construction would include a release from any infringement claims. Paragraph Six, on the other hand, suggests that before it can manufacture lithium-iodine batteries, Medtronic must obtain a license from CRC or face liability for both injunctive relief and damages. A simple reading of these contradictory passages in the context of the entire agreement does not dispel their ambiguous nature. On their face, the terms are incompatible. That the express terms of the Agreement are reasonably susceptible of more than one construction cannot, in the view of the Court, be seriously disputed.[5]

█ If the writing is ambiguous, a court must ascertain the intent of the parties and determine the meaning of the language by looking to the circumstances surrounding the making of the contract and to the parties' own subsequent interpretation of the agreement. *Fitch v. Doke*, 532 F.2d 115, 117 (8th Cir. 1976); *H. K. Porter Co. v. Wire Rope Corp. of America, Inc.*, 367 F.2d 653, 660 (8th Cir. 1966). *See Pitcairn v. American Refrigerator Transit Co.*, 101 F.2d 929, 936–37 (8th Cir. 1939). In construing the contract, the words must be given their plain and ordinary meaning, *Universal Towing*, 579 F.2d at 1101, and *each* word of the contract should be given effect whenever possible. *Fitch*, 532 F.2d at 117.

It appears quite certain that Medtronic's intent in entering into the agreement with CRC was to ensure that the WGL transfer would materialize, allowing Medtronic to begin manufacturing the lithium-iodine battery. At the time, Medtronic had invested substantially in facilities and training in anticipation of the WGL technology. The lawsuit that CRC was threatening would probably have seriously delayed or even stopped the transfer from taking place. Not only was Medtronic interested in obtaining the technology, it was also poised to begin manufacturing the batteries. The timing of the product development was quite likely, in the view of the Court, a primary motivating factor for the Agreement. The fact that the contract price was agreed upon with relatively little debate supports the notion that Medtronic believed that it was very important to commence manufacturing as quickly as possible. Medtronic's intent to manufacture was obviously known to CRC. Information about the plan was released by Medtronic in a news release dated March 11, 1976. CRC's intent, on the other hand, was undoubtedly to protect whatever rights it believed it had in the material that WGL was about to disclose to Medtronic.

Subsequent to the execution of the Agreement, Medtronic and CRC negotiated over the possible terms of a patent license. Medtronic recognized at the time that there were possible infringement problems with its manufacturing plan. The parties now disagree over what the scope of the license negotiations actually was—just as they did at the time they were negotiating. Although it is reasonable to assume that Medtronic may have believed the patents to be invalid or not included in the WGL transfer and as a result negotiated just for the purpose of avoiding the cost of later infringement litigation, it seems more likely that both parties intended the license negotiations to be a second step in their agreement to permit Medtronic to manufacture the battery. At least at the time the Agree-

---

5. The principle that ambiguously drawn contracts must be construed against the drafter is not applicable here since both parties drafted portions of the language that is inconsistent.

ment was executed, this appears to have been the parties' intent. CRC consistently intended to negotiate a license agreement. It is important, however, to note that CRC apparently did not attempt during this time to stop Medtronic from manufacturing the batteries—the license negotiations were the extent of their relationship at the time.

Another significant factor is the amount of money that Medtronic agreed to pay under the Agreement: $250,000. It seems somewhat farfetched to believe that Medtronic would pay that substantial sum of money merely for the privilege of not disclosing to CRC what it was receiving from WGL. It is impossible to determine at this time whether certain "trade secrets and CRC proprietary information" disclosed in the WGL/Medtronic transfer could have been valued at this sum. In any event, it is likely that Medtronic would not have agreed to the payment of $250,000 without receiving some rights to manufacture the batteries without threat of being enjoined. It is also likely, however, that royalties for battery production were not included in this sum since no percentage figure or flat sum per battery was a part of the bargain. Although a flat amount such as $250,000 could reasonably be construed as a royalty payment, it seems more likely in this instance that the sum included payment for whatever proprietary information was transferred and for the right to use the materials without fear of being enjoined. The figures discussed during the subsequent license negotiations support such a construction.

The language used by the parties in the Agreement is also important. CRC claims that the Agreement merely covered the transfer of the information. Such a construction, however, ignores one key word. Paragraph One bars CRC from restraining or interfering with Medtronic "receiving *and using*" the information. (Emphasis added.) Since Medtronic clearly disclosed its intent to manufacture the batteries and had already constructed facilities to that end, it seems likely that "using" was intended to refer to manufacturing. Without such a construction, the technology would likely have had little value to Medtronic.

There is nothing magic about the word "license" that requires its placement in an agreement before a patented product can be manufactured by another company. A party can agree not to take legal action against another even if its patent is arguably being infringed. *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 482 F.2d 317, 320 (6th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). Although such an action can often be interpreted as an implied license, *see De Forest Radio Telephone Co. v. United States*, 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927), that interpretation will necessarily be dependent on the contract, or if the writing is ambiguous, on the parties' actions. In this case, it is quite unlikely that Medtronic could succeed on an implied license theory because of the language contained in Paragraph Six and the parties' subsequent conduct.

The use of words such as "restrain" and "interfere" also is supportive of the view that Medtronic was permitted under the Agreement to manufacture the battery without threat of being enjoined. These words are generally used when referring to injunctive relief and have no similar connotations with respect to actions for damages such as, for example, an action for damages based on patent infringement.

CRC's claim that the Agreement only bars it from enforcing its legal rights relating to trade secrets and other proprietary information is not supported by the language of the Agreement. Paragraph One expressly applies to "any and all information" transferred from WGL to Medtronic. The language does not appear to distinguish in any way between patent rights and trade secrets or proprietary information.

Paragraph Six does refer to a license. It states that nothing in the Agreement can be construed to grant Medtronic a license under any of CRC's patents. The language is direct and specific: Medtronic has no license at this time and one cannot be implied by the Court. However, as discussed earlier, an owner of a patent can bar itself

by contract from exercising some or all of its legal rights over the patented material. In this case, it appears likely that CRC did bar itself from exercising its right to seek an injunction stopping manufacture of the batteries. It did, however, reserve its rights to enter into a license agreement or to seek damages for patent infringement. Such an interpretation is clearly supported by Paragraph One and is *not* inconsistent with Paragraph Six. The contract is not being construed to grant Medtronic a license—damages for possible infringement are not barred. Under this construction, CRC is merely barred from seeking injunctive relief, and Paragraph Six is not read out of the Agreement.

Paragraph Two purports to grant Medtronic a complete release from *any* type of legal claim that could be raised by CRC. If correct, this might even bar the counterclaims in this action. Although to an extent consistent with Paragraph One even though it provides a much more complete bar than Paragraph One, Paragraph Two can be viewed as consistent with Paragraph Six only to the extent that it bars injunctive relief. Although Paragraph Two could be viewed as consistent because it does not specifically include damages relief for patent infringement in its bar, the broad scope of the language would appear to preclude such a view.

To give complete effect to Paragraph Two would effectively grant an implied license—a result prohibited by Paragraph Six. The "nothing herein" language of Paragraph Six supports the view that Paragraph Six prevents Paragraph Two from implying a license. Furthermore, a complete release would be inconsistent with the intent of the parties, their subsequent construction of the Agreement, and other significant extrinsic evidence. In addition, Medtronic appears not to seriously contend

that the Agreement bars all possible legal action, admitting that a royalty may be due if the two patents are found valid and infringed. Despite the language of Paragraph Two, it appears unlikely that the parties intended such a result.[6]

What appears likely to the Court is that Medtronic may succeed at trial in showing that the Agreement prevents CRC from enjoining Medtronic from manufacturing the lithium-iodine battery on the basis of the technology received from WGL. It is unlikely that the Agreement could be found to bar CRC from seeking damages for infringement. The intent of the parties, the circumstances under which the contract was executed, and the subsequent construction by the parties support this view. Although clearly ambiguous, the language of the contract itself supports this view with only a very slight contravention of the principle that apparently conflicting contractual provisions are to be construed with a view toward reconciliation. To the extent that they seek injunctions against foreign subsidiaries[7] of Medtronic barring the company from manufacturing and selling lithium-iodine batteries, CRC's Canadian and German lawsuits appear likely to be found in breach of the June 25, 1976 Agreement. Actions for, damages are not likely to be so affected.

In examining the threat of irreparable harm to Medtronic which would be caused by the foreign injunctions, it is important to note the apparent significance of the lithium-iodine battery in the pacemaker industry. While other types of batteries are certainly available, the widespread adoption in the industry of the lithium-iodine cell demonstrates its advantages. Currently, Medtronic uses the battery in all of its SPECTRAX pacemaker production (Meyer Affidavit ¶ 20) and represents that alterna-

6. Because the likely construction appears obvious, the Court need not resort to the secondary rule of contract construction that a more specific provision prevails over an inconsistent general provision. *See Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.*, 436 F.Supp. 262, 270 (D.Me.1977). Whether Paragraph Six is more

specific than Paragraph Two need not be resolved at this time.

7. The Agreement expressly applies to "Medtronic, Inc., . . . and Medtronic's subsidiaries, including but not limited to Medtronic's battery manufacturing operations . . . ."

tive sources for obtaining the battery are extremely limited. (Mahle Affidavit ¶ 6). Because the pacemaker industry is so highly competitive, a disruption in sales and the resulting loss of market share which could be caused by an injunction could very well result in irreparable harm.[8]

If this motion is granted, CRC, on the other hand, would be prevented from stopping Medtronic from manufacturing and selling pacemakers which include the lithium-iodine cell in any jurisdiction until trial can be had on the merits of the claim. CRC would not, however, be similarly delayed in any action for damages for patent infringement. Presumably, CRC can be adequately compensated for the delay if it eventually succeeds on the breach of contract action. Furthermore, if CRC successfully obtains foreign injunctions based on infringement of the foreign patents and the Agreement is later found to bar CRC from seeking injunctive relief, CRC may be liable for substantial damages.[9]

In the view of the Court, Medtronic faces a substantial threat of harm—the loss of its German and Canadian market shares—if this injunction is not granted. CRC does not face any loss of rights—its damage actions are not affected—and as a result, the Court believes that the balance of hardships tips in favor of Medtronic.

A proper analysis of the public interest factor is less clear. Medtronic claims that the public in West Germany and Canada will be significantly harmed if the Medtronic pacemakers are removed from the market in those countries. Certainly the pacemaker is in many instances a very necessary medical device that cardiac patients can ill afford to do without. Presumably, other companies market pacemakers in these two countries, but the effect of removing Medtronic's product from the market may result in some temporary shortages.

Perhaps the most serious question raised by this motion, however, concerns the impact on the Canadian and German courts if this motion is granted. That question is one of the comity that courts of one jurisdiction owe to courts of another jurisdiction. Even though the Court is asked merely to restrain CRC from proceeding with actions for injunctive relief, such a ruling would necessarily affect, albeit not interfere directly with, the powers of the foreign courts in which actions have been filed. *Compare Galco Food Products, Ltd. v. Goldberg*, 171 U.S.P.Q. (BNA) 379, 381 (N.D.Ill. 1971), *with Donovan v. City of Dallas*, 377 U.S. 408, 413, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964). Those courts would be unable to rule on the injunctive relief issue—the infringement and validity substantive issues would not be affected.

 It is clear that this Court has the power to enjoin a party before it from pursuing similar litigation before a foreign tribunal. That power is discretionary with the Court. *Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.*, 412 F.2d 577, 578 (1st Cir. 1969); *Sperry Rand Corp. v. Sunbeam Corp.*, 285 F.2d 542, 544–45 (7th Cir. 1960); *Western Electric Co., Inc. v. Milgo Electronics Corp.*, 450 F.Supp. 835, 837 (S.D. Fla.), *appeal dismissed*, 568 F.2d 1203 (5th Cir. 1978); *Galco Food Products*, 171 U.S. P.Q. (BNA), at 381; *Velsicol Chemical Corp. v. Hooker Chemical Corp.*, 230 F.Supp. 998, 1017 (N.D.Ill.1964). *See also Cole v. Cunningham*, 133 U.S. 107, 121, 10 S.Ct. 269, 273, 33 L.Ed. 538 (1890) (presence of parties

---

**8.** In fiscal year 1979–1980, Medtronic's Canadian sales totaled $7.5 million. During the same period, Medtronic's German sales totaled $18.5 million. Medtronic represents that sales figures in those countries have steadily increased since that time. (Weiland Affidavit.)

**9.** The issue of whether foreign patents are being infringed is, of course, entirely separate and independent from the issue of infringement of United States patents. *Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.*, 412 F.2d 577,

579 (1st Cir. 1969). The breach of contract issue, however, is not similarly separate in another jurisdiction. An American judgment against CRC could render it powerless to seek injunctive relief against Medtronic in a foreign jurisdiction. *Velsicol Chemical Corp. v. Hooker Chemical Corp.*, 230 F.Supp. 998, 1018 (N.D.Ill. 1964). *Cf. Western Electric Co., Inc. v. Milgo Electronic Corp.*, 450 F.Supp. 835, 839–40 (S.D. Fla.), *appeal dismissed*, 568 F.2d 1203 (5th Cir. 1978).

confers on district court jurisdiction to act). Exercise of the power is dependent to a significant degree on the similarities between the litigation before the court and the litigation in the foreign court. The parties must be the same; the issue must be the same; and resolution of the first action must be dispositive of the action to be enjoined. *Bethell v. Peace*, 441 F.2d 495, 498 (5th Cir. 1971); *Western Electric*, 450 F.Supp. at 837; *Galco Food Products*, 171 U.S.P.Q. (BNA), at 381.

■■■ In the matter now before the Court, these requirements appear to be fully satisfied. The parties are the same: CRC is suing subsidiaries of Medtronic in the foreign courts. The issue is the same: whether the Agreement bars CRC from seeking injunctive relief.[10] It should be noted that this case does *not* present the common problem which befalls other similar actions; Medtronic is not seeking to enjoin a foreign court on the basis of a patent validity or infringement finding by a United States court. Foreign patents, despite covering precisely the same product as an American patent, present separate and independent rights. *Boesch v. Graff*, 133 U.S. 697, 10 S.Ct. 378, 23 L.Ed. 787 (1890); *Canadian Filters*, 412 F.2d at 579; *Sperry Rand*, 285 F.2d at 544–46. American patent rulings thus have no effect in a foreign court examining the same product under the laws of that jurisdiction. Consequently, parties cannot obtain injunctions against the foreign claims on the basis of the American infringement decision. Where patents are the issue, the subject matter is not the same. *Western Electric*, 450 F.Supp. at 838. The issue now before the Court, however, does not involve the patents. Rather, it involves the Agreement, a contract between the parties. And if the Agreement is found to bar CRC from seeking injunctive relief, CRC's foreign requests for injunctive relief are improper and they can be enjoined. *Galco Food Products*, 171 U.S.P.Q. (BNA), at 381; *Velsicol Chemical*, 230 F.Supp. at 1018. *Cf. Western Electric*, 450 F.Supp. at 839. The issue is the same and resolution of the issue would be dispositive of the foreign requests for injunctive relief.[11]

The principle of comity, which has been described as a blend of courtesy and expedience,[12] demands that the Court use extreme care and restraint in taking any action which would interfere in any way with the jurisdiction of a foreign court. *Canadian Filters*, 412 F.2d at 578; *Galco Food Products*, 171 U.S.P.Q. (BNA), at 381–82. Regardless of the fact that the Court has the power over the parties to grant the injunctive relief, the relief would directly affect the foreign courts so care must be used. *Canadian Filters*, 412 F.2d at 578.

Ordinarily the Court would be extremely wary about interfering in even an indirect manner with the jurisdiction of a foreign sovereign, even where it clearly had the power to take such action. However, several factors present in this case persuade the Court that a preliminary injunction is necessary. First, the relief sought is limited—the injunction will in no way interfere with

10. *See* note 7, *supra*.

11. The issue of whether the Anti-Injunction Act, 28 U.S.C. § 2283, is applicable here has been raised. There are conflicting cases concerning the applicability of the Act when a foreign action, instead of a State action, is sought to be enjoined in the district court. One thing is certain: by its express terms the Act applies only to Federal court stays of State court actions and it is not directly applicable to foreign actions. One court points out that the Congressional policy upon which section 2283 is based should be reflected by a similar reluctance to interfere with foreign courts. *Canadian Filters*, 412 F.2d at 579. Other courts, however, have interpreted the absence of direct application to foreign courts to mean that the statute is wholly inapplicable. *Harvey Aluminum v. American Cyanamid Co.*, 203 F.2d 105, 108 (2d Cir.), *cert. denied*, 345 U.S. 964, 73 S.Ct. 949, 97 L.Ed. 1382 (1953); *Galco Food Products*, 171 U.S.P.Q. (BNA), at 381. The Court need not determine which approach is correct since the issue is already encountered as a result of the care and restraint imposed by the principle of comity. It is enough simply to say that section 2283 is not directly applicable but the policy of the Act is already made part of the Court's determination by virtue of comity.

12. *Canadian Filters*, 412 F.2d at 579.

the patent infringement and validity actions in the foreign courts, nor will it interfere with any damage awards. It merely affects any injunctive relief which CRC may seek. Secondly, as the balancing of hardships exercise earlier indicated, significant harm can be prevented by issuance of a preliminary injunction. Third, although two foreign actions have already been brought, there has not yet been a judgment entered in either case. This Order would not interfere with a final judgment of a foreign court. Fourth, it is entirely appropriate to determine the breach of contract issue in the United States since the contract was entered into in this country, all of the witnesses are here, and the appropriate documents are written in English. The problem of translating the contractual language is eliminated. *See Bethell v. Peace*, 441 F.2d 495, 498 (5th Cir. 1971). Relitigation of exactly the same point, under more difficult circumstances, is also avoided. The Court finds no evidence that the foreign suits are vexatious or harassing, or that they were brought to evade the protections of American law. Nevertheless, the equitable considerations just discussed would clearly be prejudiced if the Court strictly adhered to the principle of comity. *See Galco Food Products*, 171 U.S.P.Q. (BNA), at 382.

CRC relies very heavily on the *Canadian Filters* case. The requested injunction in that case, however, was denied because it sought on the basis of an American patent action to enjoin the Canadian court from determining Canadian patent issues. *Canadian Filters*, 412 F.2d at 579. That request ran afoul of the rule that foreign patent rights are separate and independent from American patent rights. The breach of contract issue in this matter, on the other hand, does not pose that same key problem. *See Velsicol Chemical*, 230 F.Supp. at 1018.

■ The Court is of the opinion that a preliminary injunction should issue in this case. It appears likely that Medtronic will succeed, based on the evidence thus far presented, in the limited fashion outlined above in the breach of contract action.

Medtronic faces a possibility of irreparable harm if the injunction does not issue, and the balance of hardships definitely favors Medtronic. The public interest in the outcome does not detract in any way from the balance of equities favoring Medtronic. The principle of comity does not require the Court to restrain from granting the motion. It must be emphasized that the preliminary injunction only prevents CRC from obtaining injunctive relief until trial. Infringement and validity actions that seek damages are not affected. Considering all factors, this is precisely the type of action which "requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems*, 640 F.2d at 113. (footnote omitted.)

In the view of the Court, it is extremely unfortunate that the parties in this case plunged ahead without clearly defining their respective rights. The Court suggests that trial on the issues raised by the lawsuit be had as soon as reasonably possible in order to limit any potential damage awards.

Based on the memoranda, exhibits, and affidavits submitted by the parties, the arguments of counsel, and the entire record herein,

IT IS ORDERED THAT:

1. CRC's appeal of the Magistrate's Order granting Medtronic leave to amend its complaint be denied. The Magistrate's Order is affirmed.

2. Medtronic's motion for a preliminary injunction be granted.

3. CRC be, and hereby is, enjoined until trial can be had on the merits from instituting or prosecuting any lawsuit in any country against Medtronic or its subsidiaries for infringement of any patent corresponding to United States Letter Patents 3,660,163 or 3,674,562 to the extent that such lawsuits seek to enjoin or otherwise interfere with Medtronic's manufacture of lithium-iodine batteries for use in Medtronic's pacemakers or with Medtronic's sales of pacemakers using lithium-iodine batteries. This preliminary injunction also applies to any action in which CRC seeks seizure or destruction of Medtronic's lithium-iodine batteries.

4. This preliminary injunction does not prohibit CRC from instituting or prosecuting any patent infringement or validity action against Medtronic which seeks as relief damages for alleged infringement.