**H. K. PORTER COMPANY, Inc., a Corporation, Appellant,**

v.

**WIRE ROPE CORPORATION OF AMERICA, INC., Appellee.**

**No. 18259.**

United States Court of Appeals Eighth Circuit.

Oct. 7, 1966.

Rehearing Denied Nov. 8, 1966.

---

Paul Van Osdol, Jr., of Terrell, Van Osdol & Magruder, Kansas City, Mo., for appellant; Guy A. Magruder, Jr., and Richard M. Erickson, Kansas City, Mo., on the brief.

O. W. Watkins, Jr., of Strop, Watkins, Roberts & Hale, St. Joseph, Mo., for appellee; R. Eugene McGannon, Kansas City, Mo., on the brief.

Before VOGEL, Chief Judge, and MATTHES and MEHAFFY, Circuit Judges.

VOGEL, Chief Judge.

Wire Rope Corporation of America, Inc., hereinafter referred to as Wireco or appellee, brought this suit against H. K. Porter Company, Inc., hereinafter known as Porter or appellant, in which Wireco sought to recover in Count 1 the amount it paid out allegedly in behalf of Porter for accrued vacation liability due by Porter to its Leschen Division employees on March 31, 1962, and in Count 2, a determination that it was the owner of a group annuity contract, hereinafter referred to as AC–364, issued by the Equitable Life Assurance Society. Porter had sold to Wireco its Leschen Division. Disputes between the parties developed after closing of the sale and required an interpretation of the sales contract and the instrument which conveyed the business from Porter to Wireco.

The case was tried in the District Court without a jury and resulted in judgment for Wireco in the amount of $31,950 on Count 1 and a determination on Count 2 that Wireco was the owner of AC–364. Porter thereupon brought this appeal from the judgment entered in the District Court. We affirm.

Beginning in late 1961 Wireco sought to purchase from Porter a portion of the latter's business, hereinafter referred to as Porter's Leschen Division. Final draft of the sale contract was negotiated during the period from March 8 to March 10, 1962. Present at the negotiating sessions were the vice president (Mann) and general counsel (Obert) representing Porter and the board chairman (Barclay), president (Josendale), treasurer (Heim), and attorney (McGannon) of Wireco. The final contract (hereinafter referred to as the sale contract) entered into on March 10, 1962, called for Wireco to purchase the assets of Leschen at book value and to assume certain of Leschen's obligations. The total purchase price was some $3,000,000.

The sale contract in pertinent part provided as follows:

"WHEREAS, Wireco desires to purchase from Porter and Porter desires to sell to Wireco certain assets of Porter's LESCHEN WIRE ROPE DIVISION (herein called 'Leschen Division'),

"NOW THEREFORE * * *

"1. *Assets to be Sold:* Wireco agrees to purchase as of the close of business March 31, 1962 from Porter and Porter agrees to sell to Wireco the following assets of the Leschen Division:

[certain property]

"(c) * * * *and all other assets and property of the Leschen Division not specifically included in this paragraph 1 and not specifically excluded in paragraph 2.*

2. *Exclusion of Assets:* The following assets of the Leschen Division

are specifically excluded from the sale of assets under this agreement:

"(a) All cranes and scales in the warehouse buildings.

"(b) All land and buildings, including power plant equipment and boilers.

"(c) Cash.

"(d) *Notes and accounts receivable*—customers, more than ninety (90) days old on March 31, 1962; inter-company and inter-division notes and accounts receivable; and notes and accounts receivable other than from customers.

"(e) *Prepaid items.*

\* \* \* \* \* \*

"7. *Assumption of Contracts:* Concurrently with the purchase of the foregoing assets, *Wireco will assume and take over and perform, in accordance with their terms, the following:*

\* \* \* \* \* \*

"(d) *Union contract, effective July 4, 1960, entered into with the following three unions:*

"(i) District #9 of the International Association of Machinists;

"(ii) International Brotherhood of Electrical Workers, Local #1;

"(iii) Building Service Employees Union Local #50,

and related agreement with the same unions dated November 30, 1960, and providing for pension plan for hourly paid employees of the Leschen Division, copies of which agreements have heretofore been furnished to Wireco. Also, union contract with Teamster Union Local #860—IBT at San Francisco Warehouse.

"8. *Proration of Taxes, Insurance, etc.:* Personal property taxes, insurance (other than on buildings), utility charges, rentals and prepayments on any operating or servicing contracts concerning or affecting Porter's Leschen Division shall be pro rated as of the closing date.

\* \* \* \* \* \*

"10. *Agreements of Porter:* \* \*

"(d) Porter will deliver at the closing to Wireco such instruments of assignment and transfer as may reasonably be deemed advisable by counsel for Wireco to vest in Wireco good title to all of the assets to be purchased hereunder. Porter agrees following closing to deliver such additional instruments of assignment and transfer not obtained at closing as may reasonably be deemed advisable by counsel for Wireco to vest in Wireco good title to all assets to be purchased hereunder." (Emphasis supplied.)

Pursuant to paragraph 10 of the sale contract, Porter delivered to Wireco at the time of closing (March 31, 1962) a document entitled "General Instrument of Conveyance and Transfer from [Porter] to [Wireco]", (hereinafter referred to as the conveyance document). Pertinent portions of the conveyance document were as follows:

" \* \* \* Porter, for good and valuable consideration, receipt of which is hereby acknowledged, does by these presents bargain, sell, grant, convey, transfer and deliver to Wireco, its successors and assigns, the following assets of Porter's Leschen Wire Rope Division ('Leschen Division'):

\* \* \* \* \* \*

"(d) *All other assets, properties and rights of the Leschen Division of every name and description, tangible and intangible, wherever located, and not specifically listed in this instrument, but Excepting, However, the following:*

\* \* \* \* \* \*

"(iv) *Notes and accounts receivable; and*

"(v) *Prepaid items."* (Emphasis supplied.)

As indicated, Count 1 of Wireco's complaint concerns accrued liability for vacation pay due to Leschen's employees pursuant to a contract entered into between Porter and the union representing Leschen's employees (hereinafter referred to as the union contract). The union

contract was assumed by Wireco in paragraph 7 of the sale contract. Article IV of the July 4, 1960, labor contract provides in part as follows:

"ARTICLE IV

"Vacations

"*Section 1.* All employees of one (1) year's continuous service with the Company immediately preceding June 1st in any year shall receive one (1) week's vacation with pay based on forty (40) hours' pay. * * * All employees of three (3) years' continuous service immediately preceding June 1st in any one year shall be entitled to two (2) weeks' vacation with pay. All employees of twelve (12) years' continuous service immediately preceding June 1st in any one year shall be entitled to three (3) weeks' vacation with pay.

"*Section 2.* For the purpose of the foregoing clause, an employee employed prior to December 1st in any one year will be deemed to have been employed one year as of June 1st following. Thereafter, one-twelfth ($\frac{1}{12}$) of vacation credit shall be earned for each full month worked.

"The first two (2) weeks of vacation shall be in the period between June 1st and September 1st and the third week of vacation shall be at any time during the year: * * *.

"*Section 3.* Employees terminating their employment with the Company for any reason whatsoever, or laid off, after one year of service shall receive one-twelfth ($\frac{1}{12}$) of their regular vacation allotment due them at the time of such termination for each full month worked after the start of last vacation period.
* * *

* * * * * *

"*Section 5.* Employees will receive vacation pay at the time they take their vacation in accordance with the above section."

The vacation pay in question, stipulated by the parties to amount to $31,950, had accrued prior to the time Wireco took control of Leschen. The accrued sum, however, did not become due until the affected Leschen employees took their vacations, which occurred sometime after March 31, 1962. The District Court found as follows:

"The date of the contract was March 10, 1962, and plaintiff took over the assets as of the close of business March 31, 1962.

"On March 31, there were certain employees of Leschen whose earned vacation pay was then accrued and due. These amounts were thereafter paid by Wireco, and upon demand, were reimbursed by Porter. There were other employees to whom benefits had accrued and which became due between March 31 and June 1, 1962. The amounts had accrued on a monthly basis under the labor contract during the twelve month vacation period.

"As Wireco paid these amounts it billed Porter as it had done after paying the amounts due before March 31, and Porter declined to pay on the ground that under the terms of its contract, Wireco had assumed the obligation to pay such amounts."

In contrast to the District Court's findings, supra, Porter alleges that any payments it made on accrued vacation pay due to Leschen's employees before March 31, 1962, were made directly to the Leschen employees involved and were not made as a reimbursement to Wireco. Regardless of this, the accrued vacation pay appeared as a liability on Leschen's balance sheet on the date of the sale of Leschen to Wireco. The trial court found from the testimony that it was agreed that Wireco was not to assume any liabilities showing on Leschen's balance sheet. Porter paid off other of Leschen's liabilities but not the vacation pay which had accrued up to March 31, 1962. The accrued vacation pay was not deducted from the purchase price at closing. As to Count 1, Judge Duncan entered judgment for Wireco in the amount of $31,950, representing the accrued vacation pay to March 31, 1962, subsequently paid by Wireco to Leschen's

employees. He held that the assumption of the union contract by Wireco was intended to be *prospective* only.

Concerning Count 2 of Wireco's complaint, it successfully contended in the District Court that the group annuity contract issued by the Equitable Life Assurance Society, AC–364, and all benefits accruing from AC–364 passed to Wireco as an asset of Leschen under the terms of the sale contract. The sale contract stated that Wireco was to get "all other assets and property of the Leschen Division not specifically included in this paragraph 1 and not specifically excluded in paragraph 2." It should be noted here that the conveyance document, supra, transferred from Porter to Wireco

"All other assets, properties and rights of the Leschen Division of every name and description, tangible, and intangible wherever located, and not specifically listed in this instrument, but Excepting, However, the following:

\* \* \* \* \* \*

"(iv) Notes and accounts receivable; and

"(v) Prepaid items."

Porter contended that AC–364 was Porter's own asset and not that of Leschen. Alternatively, Porter urged that the annuity was an account receivable or a prepaid item, thus meaning that under paragraph 2 of the sale contract it would not pass to Wireco.

AC–364 was initially issued to A. Leschen & Sons Rope Co. at sometime before Leschen became a subsidiary of Porter. The last payment due under AC–364 was made by A. Leschen & Sons on July 31, 1953. In July 1953 Porter purchased a controlling interest in A. Leschen & Sons and merged it with the Watson-Stillman Company, another subsidiary of Porter's. Watson-Stillman acquired AC–364 under the terms of the merger. In November 1962 Watson-Stillman was liquidated and Porter again owned AC–364 on behalf of its Leschen Division. However, at that time the AC–364 document still stated its owner-employer to be "Watson-Stillman Leschen Division". Later AC–364 was amended by a rider to show Porter as the owner-employer. There was dispute between Porter and Wireco as to whether this rider was executed before or after the date of the sale of the Leschen assets to Wireco. The rider itself, while showing that its effective date is November 30, 1960, nevertheless shows the execution date as August 28, 1962, some five months after the sale to Wireco.

It was not until after the March 31, 1962, closing date for the sale of Leschen to Wireco that Wireco learned of the existence of AC–364 and that Porter was receiving dividends thereunder.

Testimony of experts supported the contentions of both parties regarding whether or not AC–364 should have been characterized as an asset, as an account receivable or as a prepaid item. The record also indicates that while Leschen was owned by Porter, the dividend checks paid under AC–364 were merely placed by Porter in the cash account of Leschen. The existence of AC–364 was not mentioned in the March 8th to 10th negotiating sessions. AC–364 and dividends payable thereunder were not carried on the Leschen Division balance sheets. Judge Duncan, however, found that AC–364 was an asset of Leschen and thus held that the ownership of AC–364 passed to Wireco under the sale contract as of March 31, 1962. Judge Duncan also awarded Wireco $16,762.39, an amount received by Porter under AC–364 as a dividend in October 1962.

As to Count 1 of Wireco's complaint, it is the contention of Porter on this appeal that all obligations under the labor contract, including liability for vacation pay earned but not due, were assumed by Wireco and that the trial court erred (1) in holding Porter liable for the vacation pay and (2) in using parol evidence to reach its determination.

The parties have heretofore agreed that this case is controlled by the law of the State of Missouri.

Porter contends that only one reasonable construction can be given to paragraph 7 of the sale contract which is

set out under the facts, supra. It claims that Wireco agreed to assume, take over and perform the union contract in its entirety according to its terms. Under the terms of the union contract, no vacation pay was due as of March 31, 1962 and did not become due until the Leschen employees involved decided to take vacations sometime after that date and that the sale contract contains no language which would exclude the accrued vacation pay as a liability to be assumed by Wireco. Porter also points out that paragraph 8 [1] contains no reference to prorating vacation pay for the obvious reason that the sale contract clearly called for Wireco's assuming that liability and there was thus no need to prorate. Porter argues that a finding of ambiguity in the contract cannot be sustained merely because the parties do not agree as to its construction, citing National Surety Corp. v. Curators of University of Missouri, 8 Cir., 1959, 268 F.2d 525, and Mickelberry's Food Products Co. v. Haeussermann, Mo.Sup., 1952, 247 S.W. 2d 731.

Wireco argues that the intent of the parties is deduced from the sale contract and from the testimony in evidence at trial was for Wireco to assume Porter's obligations under the union contract accruing from and after March 31, 1962. It claims that the wording of the sale contract, even if unambiguous, supports Wireco's position rather than that of Porter, directing attention to the trial court's statement as follows:

"The contract seems to be perfectly clear and unambiguous in its provisions that 'concurrently with the purchase of the foregoing assets Wireco will assume and take over and perform in accordance with their terms the following:' (referring to the labor contract)."

The trial court continued:

"Under the terms of the labor contract which was executed on January 1, 1958, *benefits accrued each month to each employee, and while not necessarily payable at the time of accrual, the amounts became a liability of the employer and was so recognized and carried on its books as such.*

*"During their negotiations the parties had before them Leschen's balance sheets which at all times showed the amount of accrued vacation pay as a liability.* The balance sheet of December 31, 1961, showed the liability as $25,963.00; January 31, 1962, as $28,775.00; February 28, 1962, $31,315.00 and March 31, 1962, when the transfer was made, as $30,822.00. We believe parol evidence was admissible to show these facts.

"Wireco was purchasing assets and not liabilities. Plaintiff's agreement to assume liability under the labor contract, in view of the fact that it was purchasing assets only, is not inconsistent with its contention that it was not liable for accrued vacation pay to date it took over the conduct of the business. In this connection, Porter's Vice-President Mann, who conducted the negotiations for Leschen, in his deposition offered in evidence as an admission, stated:

'Q. How about assumption of liability? Was that discussed?

'A. They were to be excluded, actually, I believe, insofar as what was on the balance sheet. *The various payrolls, accounts payable, etc., these were going to continue to be our liability.*

'Q. *The balance sheet liabilities were retained by Porter, not assumed by Wire Rope Corp.*

'A. *Yes.*

1. Paragraph 8 of the sale contract provides:
"8. *Proration of Taxes, Insurance, etc.*: Personal property taxes, insurance (other than on buildings), utility charges, rentals and prepayments on any operating or servicing contracts concerning or affecting Porter's Leschen Division shall be pro rated as of the closing date."

MR. WATKINS: I say those that were disclosed on the balance sheet, Mr. Van Osdol?

'THE WITNESS: *Yes, those that were listed as liabilities on the liability side of the balance sheet were to be excluded.*'

"At the trial on cross-examination the same witness said:

'Q. In other words, Mr. Mann, you were concerned with the assets that were being sold because you recognized that you were retaining the balance sheet liabilities, is that true?

'A. We were going to accept the operating liabilities up to the date of closing, yes.

'Q. *You were going to accept the balance sheet liability up to the date of closing, were you not?*

'A. *Yes.*'

"It is clear from the evidence that during the negotiations and at the time of the signing of the contract, that defendant was to pay operating expenses up until the time of closing. Under the labor contract, accumulated vacation pay was an operating cost. The accumulation of such pay under the terms of the labor contract, was as much a liability against the employer as was the amounts that were due at the time Wireco took over the business." (Emphasis supplied.)

 Appellant asserts that it was reversible error on the part of the trial court to admit extrinsic and parol evidence as to the meaning of the sale contract, which Porter considers to be unambiguous and of clear meaning. It is true enough that the trial court referred to the sale contract as being "perfectly clear and unambiguous" with reference to its provisions that concurrently with taking over the assets of the Leschen Division, it assumed and agreed to take over and perform the labor contract. If a contract is clear, definite and certain so that the intent of the parties can be spelled therefrom, then the provisions of the contract are binding and controlling and must be accepted "without reference to any rules of interpretation", as courts have no right to remake a contract between the parties into something other than what it clearly states and intends. Pitcairn v. American Refrigerator Transit Co., 8 Cir., 1939, 101 F.2d 929. But the late Judge Gardner, who wrote *Pitcairn*, went on to say, at pages 936–937:

"* * * But on the other hand, if the contract is ambiguous or obscure, it is open to interpretation. Generally speaking, the cardinal rule of interpretation is to ascertain, if possible, from the instrument itself the intention of the parties, and to give effect to that intention. Where there is obscurity or ambiguity, however, the language used should be read in the light of all the surrounding facts and circumstances, including the acts of the parties indicating what interpretation was placed upon it by the parties themselves. Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties. Old Colony Trust Co. v. [City of ] Omaha, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410; Topliff v. Topliff, 122 U.S. 121, 7 S.Ct. 1057, 30 L.Ed. 1110; Brooklyn L. Insurance Company [of New York] v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Sternberg v. Drainage District, 8 Cir., 44 F.2d 560; Powell v. Baker Ice Machine Co., 8 Cir., 8 F.2d 125; Wabash Railway Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335."

See, also, Eastmount Construction Co. v. Transport Mfg. & Equip. Co., 8 Cir., 1962, 301 F.2d 34, 41–42; Pasquel v. Owen, 8 Cir., 1950, 186 F.2d 263, 268. While, as Judge Duncan found, it was clear and unambiguous from the contract that Wireco would assume, take over and perform in accordance with the terms of the labor contract, it may possibly seem less clear as to whether or not that obligation was retroactive and included $31,950 accrued vacation pay which did not become due until sometime after March 31, 1962, but which was carried as

a liability on Leschen's balance sheet. This being so, we believe the District Court to have been on sound ground when it accepted evidence indicating the intention of the parties at the time they entered into the contract on March 10, 1962. The District Court, in its Memorandum Opinion, said:

"We believe that that portion of the contract providing for the taking over of the labor contract must be read and construed in the light of the whole agreement for the sale by Porter and the acquisition by Wireco of the assets of Leschen, and that the vacation pay accrued but not yet due on March 31, 1962, was Porter's liability, and that plaintiff is entitled to recover the sum of [$31,590] * * *."

Substantial evidence indicates that the parties so intended. Additionally, we point out that even without the extrinsic evidence, a reasonable and fair interpretation of the contract between the parties would indicate that Wireco was not assuming the liability for accrued vacation pay prior to March 31, 1962, which plainly appeared as a liability on Leschen's balance sheet on the date of the sale of Leschen to Wireco. We affirm the District Court's conclusion that Wireco did not assume the obligation for the accrued but not yet due vacation pay on March 31, 1962.

On Count 2, we find that Porter's claim that it owned the annuity contract, AC–364, to be equally without merit. Porter contends that it, and not Leschen, was the owner of AC–364, as evidenced by the document itself. True enough, there is a rider attached to the annuity contract which purports to transfer all right, title and interest of the employer in the contract from the Watson-Stillman Company to Porter effective as of November 30, 1960. The rider clearly shows, however, that it was executed on August 28, 1962, several months after the sale to Wireco. Porter nevertheless contends that AC–364 was not an operating asset of Leschen and that the court thus erred in classifying it as a Leschen Division asset which passed to Wireco. Porter relies on what it terms "The very comparable Missouri case of West v. Nichols, (K.C.App., 1950) 227 S.W.2d 760". Porter says:

"* * * In *West* plaintiff sold a dry cleaning business to the defendant. Certain overcharges which had been collected by the gas company before the sale were refunded after the sale and were received and retained by the defendant. Plaintiff brought suit to recover the refund. The contract of sale, after listing various items plaintiff agreed to sell, included the phrase 'and all other interests which they (the vendors) may have in the business known as "The Park Manor Cleaners & Dyers" * * *.'"

The court there held for the plaintiff. In sustaining that holding, the Missouri Court of Appeals, at page 761 of 227 S.W.2d, had this to say, however:

"It is admitted that, at the time of the sale, neither party had in mind any possible refund of money for overcharges made for gas service; but that fact is immaterial if the language used is broad enough to include the property here involved. 55 C.J. 223; Cram v. Union Bank, 42 Barb., N.Y., 426; Livingston County Bank v. First State Bank, 136 Ky. 546, 121 S.W. 451, 124 S.W. 829.

"No Missouri case is cited by either party, and they concede there is none. Defendant cites and relies on Cram v. Union Bank, supra. In that case vendor purported to sell his entire interest in a partnership, and it was later discovered that the partnership owned a bank account which everyone had completely forgotten. The contract of sale contained the following clause: '* * * and all other property and valuable thing or things, belonging to said firm, of every name and kind.' *The court held that the bank account was transferred even though the parties did not have it in mind at the time of the sale. The decision is sound, on the facts there involved, but it is not persuasive in this case.*" (Emphasis supplied.)

The facts in Cram v. Union Bank, supra, as recited by the court in West v. Nichols, supra, are much closer to the instant factual set-up than were the facts in West v. Nichols. The Missouri court specifically approves of the Cram v. Union Bank holding as being "sound on the facts there involved". Under AC–364 the Equitable Life Assurance Society agreed to pay a pension or annuity "to each employee of A. LESCHEN & SONS ROPE COMPANY (Herein called the Employer) who is included under this Group Annuity Contract No. AC 364 and who continues to be included hereunder until his retirement date. Such annuity shall be of the kind and amount determined, etc." We think it clear that the annuity contract AC–364 was an asset and followed the Leschen Division and its employees wherever they went. The fact that AC–364 was overlooked during the negotiating for this sale and that it turned up in the light of after-events is immaterial. See, West v. Nichols, supra. The broad language of both the contract and the conveyance document clearly indicates as much and they should be read and considered together. Berry v. Crouse, Mo.Sup., 1964, 376 S.W.2d 107, 111–112.

Substantial additional testimony fully justified the trial court's conclusion that ownership of AC–364 passed to Wireco by the provisions of the sale contract and the conveyance instrument. J. N. Yorke, vice president and comptroller of Porter, testified as follows:

"Q. I know, but how would you determine what were assets of the Leschen Division, as distinguished from the assets of some other division or other assets of Porter?

"A. They were recorded on the books and records of the Leschen Division.

"Q. All of them?

"A. All except any security transactions, I say. There may be some assets that have no dollar value recorded on the books, that might still be assets.

"Q. What are those?

"A. *I would classify one of those as being an annuity contract.*

"Q. *As an asset?*

"A. *Yes.*" (Emphasis supplied.) The testimony of the comptroller of Porter is thus irreconcilable with the testimony of other expert witnesses produced by Porter, who characterized the annuity contract as an account receivable or a prepaid item rather than an asset.

The record also clearly indicates that all dividends paid by Equitable under AC–364 were credited on the company books to the Leschen Division with the exception of a dividend payment of $16,762.39 paid in October 1962 subsequent to the sale from Porter to Wireco and which will be referred to hereafter. Substantial testimony of experts also characterized AC–364 as an asset of Leschen and not as an account receivable or a prepaid item. The determination of whether AC–364 was an asset of Leschen, an account receivable or a prepaid item was for the finder of the facts and the determinations so made will not be disturbed on appeal where supported by substantial testimony. We accordingly find no error in the trial court's conclusion that ownership of AC–364 passed to Wireco by the terms of the sale contract and the conveyance instrument.

Porter makes a particular point with reference to the payment of a dividend by Equitable under AC–364 of $16,762.39. This amount was not paid until October 1962, some months after the sale of the Leschen Division to Wireco. The District Court concluded that such payment should have gone to Wireco as the purchaser of Leschen assets. The amount of such dividend could not be ascertained or was not available until late in each year and we believe ownership thereof passed with AC–364 itself.

We call attention in this case, as we have in many others, to the fact that where the trial judge arrives at a permissible conclusion with respect to the law of his state we accept such conclusion as binding. See, e. g., Carman v. Harri-

son, 8 Cir. 1966, 362 F.2d 694; Johnston v. Cartwright, 8 Cir., 1966, 355 F.2d 32, 38; Hogue v. Pellerin Laundry Machinery Sales Co., 8 Cir., 1965, 353 F.2d 772, 776; Figge Auto Co. v. Taylor, 8 Cir., 1964, 325 F.2d 899, 901. Judge Duncan, long a distinguished member of the Missouri bar and for over twenty years a United States District Judge for the District of Missouri and now a Senior District Judge, has in this case arrived at permissible conclusions with respect to the law of Missouri which will not be disturbed on appeal.

This case is in all things affirmed.