**Ray G. WILLIAMS, d/b/a Williams Farm, Appellant**

v.

**Thomas A. CURTIN.**

**No. 85–6089.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1986.

Decided Dec. 23, 1986.

Stephen P. McCarron, Silver Spring, Md., for appellant.

Nathan M. Lyman, Albion, N.Y., for appellee. Sally M. Armstrong, Washington, D.C., entered an appearance for appellee.

Before: SILBERMAN and WILLIAMS, Circuit Judges, and JAMESON,* Senior District Judge.

Opinion for the Court filed by Senior District Judge JAMESON.

JAMESON, Senior District Judge:

Appellant, Ray G. Williams, d/b/a Williams Farms, filed a complaint with the Secretary of Agriculture, pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a–499s (PACA), alleging that appellee, Thomas A. Curtin, failed to pay Williams all of the contract price for cabbage sold to Curtin by Williams. Curtin counterclaimed, alleging that Williams breached the contract by failing to deliver all of the cabbage required by the contract. Following a reparation hearing, a judicial officer of the Department of Agriculture, acting for the Secretary, issued a decision in favor of Curtin, holding that Williams had breached the contract, and ordered Williams to pay Curtin $47,435.10 plus attorney fees and expenses. On appeal, the district court in a trial *de novo*, pursuant to 7 U.S.C. § 499g(c), affirmed the Secretary's decision and order. We affirm the judgment of the district court.

## I. BACKGROUND

Both the judicial officer of the Department of Agriculture and the district court made detailed findings of fact.[1] The facts

---

* Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. As noted by the district court, under the PACA, 7 U.S.C. § 499g(c), the findings of fact and orders of the Secretary are prima facie evidence of the facts stated therein. Most of the findings

relevant to this appeal may be summarized as follows:

Williams, a resident of Georgia, packages, loads, and sells produce grown by others. Curtin, a resident of New York, purchases, stores, and sells cabbage, primarily for processing into cole slaw. He purchases primarily from growers in New York, but occasionally, as in this case, purchases cabbage grown in other states. At the time of the transaction in question, both Williams and Curtin were licensed under the PACA.

In January, 1982, Curtin visited Williams in Moultrie, Georgia, intending to enter into a contract for the purchase of cabbage. Curtin desired to obtain cabbage for resale to various processors of cole slaw. The parties agreed that Williams would grow 30 acres of cabbage for Curtin. The expected yield was between 600 and 800 tons of cabbage. The agreed price was $136.00 per ton, and delivery f.o.b. was to be made between May 1, 1982 and June 15, 1982. Curtin advised Williams that he desired large cabbage, i.e., 12 heads or less per 50 pound sack. The parties did not reduce their agreement to writing in January. Instead, they agreed to do so at a later time. Curtin made an advance payment of $4,000.00 on the purchase price.

After the parties reached their agreement, Williams arranged to have the Baker brothers grow the cabbage on approximately 33 acres of land which they owned. Williams agreed to split the profits from the sale of the cabbage equally with the Baker brothers. The cabbage was planted in March, 1982. The rows were planted in such a way as to provide the best assurance possible that the cabbage grown would be large cabbage as requested by Curtin.

After their meeting in January, 1982, Williams and Curtin had several telephone conversations concerning the progress of the cabbage crop. Curtin pressed Williams for a written contract. On March 29, 1982, Williams sent Curtin a signed contract dated March 8, 1982. After Curtin made some changes, the final contract provided:

Mr. Thomas A. Curtin of Albion, New York, has agreed with Ray G. Williams d/b/a Williams Farms of Moultrie, Georgia, to the following contract for growing and purchasing cabbage for the 1982 spring season from May 1st to June 15th.

Ray G. Williams d/b/a Williams Farms is to plant and grow approximately 30 acres cabbage or approximately 600 to 800 tons of slaw cabbage to be bought by Thomas A. Curtin at a price of $120.00 per ton loaded loose or in bin boxes, $136.00 per ton loaded in bags. Bagged loads to be sold by net on truck. Mr. Curtin to pay for all necessary ice.

Thomas A. Curtin is to furnish $10,000 during growing season to be deducted from cabbage purchased. Williams is to assist Curtin in lining up trucks to carry loads.

Shortly after the parties signed the written contract, the price of cabbage unexpectedly increased dramatically. While the price of a fifty pound sack was between $3.00 and $4.00 in January, 1982, it was as high as $12.00 per fifty pound sack in May, 1982. At some point Curtin became concerned that there was something amiss with respect to the cabbage. On May 6, 1982, Curtin appeared unexpectedly at Williams' business establishment. Curtin and Williams inspected the field and found that most of the cabbage was not growing to the desired size. Curtin told Williams he would take all of the cabbage he could get from the field. He said that he would be satisfied if he got 400 tons out of the field.[2] Curtin paid Williams an additional $6,000 on account.

Cutting in the cabbage field was completed about June 10, 1982. The field yielded

---

of the judicial officer were undisputed, and the district court determined that the other findings were supported by evidence.

2. The judicial officer found that the parties had modified the amount to be delivered in May, 1982. He found that after talking to Williams and inspecting the field with Williams, Curtin agreed to reduce the volume to 400 tons.

518.4 tons of cabbage. Williams delivered all of the large cabbage from the field, 152.42 tons, to locations directed by Curtin. He disposed of the smaller cabbage through other commercial channels. The price per 50 pound sack sold to Curtin averaged $3.07. The average price of the cabbage sold to other purchasers was approximately $10.00 per sack. Because Curtin had made commitments on the basis of receiving more cabbage from Williams, he was forced to purchase on the open market to meet those commitments. The average price of the cabbage purchased on the open market was $400 per ton ($10.00 per fifty pound sack). The total amount due Williams from Curtin for the cabbage delivered was $24,121.02 ($34,121.02 less $10,-000 paid on account). When Curtin refused to pay this amount, Williams filed his complaint with the Secretary of Agriculture seeking a reparation order. Curtin responded with his counterclaim.

The focus of the reparation hearing before the judicial officer of the Department of Agriculture was the meaning of the term "slaw cabbage". Williams claimed that to members of the trade slaw cabbage meant large cabbage. Curtin claimed that it meant all cabbage suitable for making cole slaw and that under the conditions of the 1982 spring market all of the cabbage grown by Williams was suitable for making cole slaw.

The judicial officer found that, "All cabbage grown is suitable for being made into cole slaw.... During 1982 market conditions were such that many cole slaw processors were willing to receive small heads of cabbage for cutting into slaw." *Ray G. Williams d/b/a Williams Farms*, PACA No. 2–6181 at 3 (Apr. 17, 1984); Record Excerpt B at 3 (hereinafter R.E. B). He found further that, "There is no such term as 'slaw cabbage' commonly used in the production or marketing of cole slaw." R.E. B at 3. Consequently, the contract

obligated Williams to deliver all of the cabbage grown in the Baker brothers field which was suitable for making cole slaw. The judicial officer calculated Curtin's damages on the basis of Curtin's cost of covering the difference between the 152.42 tons delivered and the 400 tons required by the contract.

The district court affirmed the judicial officer's determination, saying in part: "Weighing the testimony and the numerous exhibits submitted to the Judicial Officer, the Court finds that plaintiff has failed to demonstrate that the term 'slaw cabbage' is ... a term regularly used in the trade to mean 12 cabbage heads or less per 50 pound bag." [3] *Williams v. Curtin*, No. 84–1951 at 9 (D. D.C. filed Aug. 22, 1985) (unpublished mem.).

In affirming the Secretary's decision that Curtin was entitled to an award of $47,-435.10 plus interest and attorney's fees, the district court determined that the contract between Curtin and Williams "was modified when Mr. Curtin told Mr. Williams in May 1982 that he would be satisfied with 400 tons of cabbage from the Baker Brothers' field." *Id.* at 10, n. 7.

## II. CONTENTIONS ON APPEAL

Williams contends that the district court erred in (1) failing to determine the intent of the parties as to the size of cabbage to be delivered; (2) failing to decide that the contract required the shipment of large cabbage; and (3) failing to determine if the term "slaw cabbage" was a usage of trade in the State of Georgia.

## III. INTENT OF THE PARTIES

Williams' primary contention on appeal is that the district court failed to determine the intent of the parties with respect to the size of the cabbage to be delivered. He argues that having found the contract ambiguous, applicable law required the court

---

**3.** The district court noted that a slaw processor of 17 years experience who buys about 500,000 pounds of cabbage annually, "testified persuasively that the seldom-used term 'slaw cabbage' meant cabbage suitable for processing into cole slaw." Another expert witness who was president of a slaw processing company for 23 years testified that he had "never heard the term 'slaw cabbage' used to define a specific cabbage size." *Williams v. Curtin*, No. 84–1951 at 7–8.

to determine the intent of the parties, and the court erred when "it stopped short after only considering the question of whether 'slaw cabbage' was a usage of trade." Williams requests this court to remand to the district court for a determination of the parties' intent or to hold that the record establishes that the parties intended the sale of large cabbage only.

Although the district court did not make any express finding with respect to the intent of the parties, it did affirm the findings of the judicial officer, holding, as noted above, that the judicial officer's findings were supported by evidence. The judicial officer clearly made specific findings reflecting the intent of the parties. He concluded that the contract required Williams to deliver to Curtin all of the cabbage grown in the Baker brothers' field which was suitable for being made into cole slaw.

▮ While the record indicates that Curtin preferred large cabbage, it is clear that the contract was not limited to large cabbage. As noted above, the judicial officer and the district court both found that the May 6 meeting modified the contract with respect to the volume of cabbage to be delivered. The discussions and conduct of the parties at that time are also evidence of the parties' initial intent with respect to the size of the cabbage to be delivered. *See Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1150 (D.C.Cir.1984) ("The historical interpretation given to a contract by the parties is strong evidence of its meaning."); *H.K. Porter Co. v. Wire Rope Corp.,* 367 F.2d 653, 660 (8th Cir.1966). As the judicial officer noted, it was then "obvious that much of the cabbage was not of the large size that Mr. Curtin indicated that he desired when he entered the contract with Mr. Williams in January, 1982." R.E. B at 7. The judicial officer continued:

> However, Mr. Curtin told Mr. Williams that he could take and wanted all of the cabbage from the field. Mr. Williams did not protest to Mr. Curtin that he was only entitled to the large cabbage. Rather, the discussion centered on whether 600 to 800 tons of cabbage could be delivered from the field. Mr. Williams said that he did not believe such was possible. Mr. Curtin said that he would take a lesser amount of cabbage; that 400 tons was satisfactory to him. Mr. Williams did not indicate in any way that size was a limiting factor. After visiting the field with Mr. Williams Mr. Curtin paid another $4,000.00 [sic][4] on account for delivery of cabbage under the contract. A party simply does not make payment of that nature if there is any indication that there is a question as to whether the contract terms will be met. Mr. Williams accepted the tender of payment, and eventually cashed the check. If Mr. Williams did not intend to deliver 400 tons, he should not have accepted the tender.

R.E. B at 7. Williams' failure to object when he obviously knew the field would not produce enough large cabbage to deliver 400 tons is strong evidence that the contract was not limited to large cabbage. It demonstrates that the parties contemplated the sale of at least 400 tons of cabbage which would be suitable for making cole slaw. As the judicial officer found, all of the cabbage grown in the field was suitable for making cole slaw. The judicial officer's findings with respect to the parties' intent are not clearly erroneous.

In affirming the decision of the judicial officer, the district court adopted these findings. Thus, contrary to Williams' claim, the district court did consider the intent of the parties with respect to the size of the cabbage. There is no need to remand this case to the district court for findings on the intent of the parties. Nor did the district court err, as Williams contends, in failing to decide that the contract required the shipment of large cabbage.

**4.** The actual amount of the second advance was $6,000.00.

## IV. IS THE TERM "SLAW CABBAGE" A "USAGE OF TRADE"?

The district court noted that the Uniform Commercial Code defines a "usage of trade" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." U.C.C. § 1–205(2).[5] The court concluded that Williams failed to demonstrate that the term "slaw cabbage" is a term "regularly used in the trade to mean 12 cabbage heads or less per 50 pound bag."[6]

Williams contends that the district court erred in failing to determine whether "slaw cabbage" was a usage of trade in the State of Georgia. He argues that because the contract's focus of performance was Georgia, the district court should have looked solely to the significance of the term "slaw cabbage" as used in Georgia. Williams relies on Section 1–205(5) of the Uniform Commercial Code which provides, "An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance." Williams argues that because the planting, nurturing, cutting, sizing and bagging of the cabbage was to occur in Georgia, the court should have considered only evidence on usage of trade in Georgia. We disagree.

Williams has failed to recognize that the relevant aspect of performance is not the planting, nurturing, cutting, sizing and bagging of the cabbage. Rather, the relevant aspect of performance is delivery of the cabbage. Although the cabbage was grown in Georgia, the contract called for delivery in the interstate market. As the district court noted, Section 1–205(2) de-fines a usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." The transaction in question is an interstate sale of cabbage. The parties live and transact business in separate states. Both are licensed under the PACA to buy and sell perishable agricultural commodities in interstate commerce. Williams, himself, does not grow the produce he sells. Rather, he acts as a broker or dealer in sales to others. The record indicates that Williams does business with out-of-state buyers on a regular basis. The negotiations and events leading to the present transaction took place in more than one state. Although the cabbage was grown in Georgia, the contract contemplated delivery in the interstate market. Clearly, the transaction did not involve a sub-trade consisting of only the Georgia market. *See Nanakuli Paving and Rock Co. v. Shell Oil Co.,* 664 F.2d 772, 779 (9th Cir.1981).

Official Comment 4 to section 1–205 reads: "The language used is to be interpreted as meaning what it may fairly be expected to mean to the parties involved in the particular commercial transaction in a given locality or a given vocation or trade." Since the transaction is an interstate transaction, it cannot fairly be expected that the parties contracted only with reference to the Georgia market. Where parties enter into an interstate transaction, they expect the terms of their agreement to be interpreted in light of the customs and usages of the particular interstate market involved. The district court properly construed the term "slaw cabbage" with refer-

---

5. Williams argues that Georgia law should apply. Curtin argues that New York law or the Uniform Commercial Code is applicable. Insofar as the statutory language is concerned, Georgia and New York have adopted identical versions of section 1–205. *See* Ga.Code § 11–1–205; N.Y. U.C.C. § 1–205. Thus, there is no need to decide the conflict of law issue. *See Unlaub Co. v. Sexton,* 568 F.2d 72, 76, n. 2 (8th Cir.1977) (Court referred to Uniform Commer-cial Code as applicable law rather than deciding conflicts issue where all possible jurisdictions had enacted identical versions of the Uniform Commercial Code).

6. The judicial officer had reached the same conclusion, finding that, "Only Mr. Williams testified that there was such a term as 'slaw cabbage' used in the produce industry. . . ." R.E. B at 6.

ence to the interstate cole slaw processing market.

■ Moreover, as noted above (Note 4), the judicial officer stated that Williams was the only witness who testified that there was such a term as "slaw cabbage" and that it means 12 heads or less per 50 pound sack. Williams presented additional witnesses before the district court. The court noted, however, that two of those witnesses were "clearly not disinterested witnesses as they both admit that they had prior dealings with Mr. Curtin and prefer not to do business with him." *Williams v. Curtin,* No. 84–1951 at 8, n. 4. Weighing all the evidence, the district court found Curtin's expert witnesses more persuasive and that Williams had failed to show that the term "slaw cabbage" was regularly used in the trade to mean 12 cabbage heads or less per 50 pound bag.[7] That finding is supported by substantial evidence and is not clearly erroneous. This is true regardless of whether New York or Georgia law is applied.

### V. CONCLUSION

We conclude that the district court, in affirming the findings of the judicial officer, considered the intent of the parties with respect to the size of the cabbage to be delivered. Regardless of what law it purported to apply, the court correctly found that the contract contained no size condition. The May, 1982 discussion constituted a modification of the volume to be delivered under the contract and clarified the parties' initial intent with respect to the size of the cabbage to be delivered. Appellant failed to prove that the term "slaw cabbage" is a term regularly used in the trade to mean 12 cabbage heads or less per 50 pound bag.

*Affirmed.*

7. It may be noted also that there had been a course of dealing between the parties and that the term "slaw cabbage" had never been used in any prior transaction. Rather they had used the words "large cabbage".

It has long been recognized that in actions under the PACA, the existence of a usage or

custom can only be proved by numerous instances of actual practice, and not by the opinion of a witness; and that the evidence must be clear and uncontradicted. *See California Fruit Exchange v. Henry,* 89 F.Supp. 580, 586–87 (W.D.Pa.), *aff'd,* 184 F.2d 517 (3d Cir.1950).