**TRIAD CAPITAL PARTNERS, INC., Plaintiff,**

v.

**KINETIC ENVIRONMENTAL LABORATORIES, INC., et al., Defendants.**

**No. 90–2082C(6).**

United States District Court, E.D. Missouri, E.D.

Dec. 9, 1992.

Ira M. Potter, Benson & Guest, St. Louis MO, for plaintiff.

W.T. Schmidt, Kinetic Environmental Laboratories, Inc., Mascoutah, IL, for defendants.

## MEMORANDUM OPINION

GUNN, District Judge.

This matter is before the Court after a trial before the Court sitting without a jury. This Court having considered the pleadings, the testimony and exhibits introduced at trial and the applicable law, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Plaintiff Triad Capital Partners, Inc. (Triad) brings this three-count complaint against defendants Kinetic Environmental Laboratories, Inc. (KELI) and Centralia Environmental Services, Inc. (CES), alleging various breaches of a hauling agreement and an equipment lease. Triad is a Missouri corporation with its principal place of business in Missouri. KELI and CES are Illinois corporations, each with its principal place of business in Illinois.

On or about January 11, 1989, North American Recycling, Inc. (NARI), whose majority stockholder was Triad, entered into a hauling agreement with KELI whereby KELI would haul waste from NARI's recycling center located in St. Louis, Missouri to a landfill operated by CES in Centralia, Illinois. Pursuant to section 2.04 of the hauling agreement, NARI paid KELI $100,000 in exchange for a one-dollar-per-yard reduction in the cost of hauling the initial 120,000 yards of waste. If the agreement terminated prior to the hauling of 120,000 yards of waste, KELI would repay the "pro rata portion of the unutilized advance payment" to NARI. *Id.*

NARI also purchased the landfill and transportation equipment set forth in exhibit A of the hauling agreement.[1] (Hauling Agreement § 3.0). To pay for the equipment, NARI borrowed from Southwest Bank the sum of $489,139.50. KELI leased this equipment from NARI pursuant to a separate equipment lease executed on December 30, 1988, incorporated by reference into the hauling agreement. *Id.* KELI's lease payments to NARI equalled NARI's monthly payment on its note with Southwest Bank. *Id.* The equipment lease also obligated NARI to maintain the equipment in good and serviceable condition and to keep it free of mechanic's liens. (Equipment Lease III(3) & (4)).

With regard to termination of the hauling arrangement, the hauling agreement provides that "[s]ubject to the provisions of Section 2.04, [governing repayment of the $100,000 advance,] this agreement shall terminate without further obligation to either party if the transfer of Waste, the operation of the Centralia, Illinois landfill currently operated as a contract purchaser by CENTRALIA ENVIRONMENTAL SERVICES, INC., or the disposal of waste at the landfill utilized by HAULER, is prohibited by applicable law or regulation." (Hauling Agreement § 4.0). A separate

1. Cat 816 Compactor Model 74; S/N S7U386
   DJB Articulated 35 Ton Truck
   Liebherr 641 Track Loader; S/N 0134
   Cat 816 Compactor Model 74

   2 Mack OTR Tractors with Wet Kits
   3 Transfer Trailers—100 yard capacity
   Staging Truck
   (Hauling Agreement—Exhibit A).

section of the hauling agreement also discusses termination obligations, stating that:

> Upon termination of this Agreement, HAULER shall assume COLLECTOR'S obligation to pay the unamortized principal balance of COLLECTOR'S purchase money loans, (including prepaid finance charges), plus the unamortized portion of all cash amounts invested directly, and associated with the DJB Articulated 35 ton truck, the Cat 816 Compactor operated at the landfill, and the Liebherr 641 Truck Loader, and COLLECTOR shall assign all right to title to the foregoing assets to HAULER, and COLLECTOR shall provide HAULER with a warranty bill of sale to the foregoing assets, free and clear of all encumbrances except the loans assumed by HAULER.
>
> Upon HAULER'S election, HAULER may include the remaining assets described on Exhibit "A" in this assumption of debt and conveyance of title, otherwise, these assets shall remain COLLECTOR'S property and the debt thereon shall be COLLECTOR'S obligation to satisfy.[2]

(Hauling Agreement § 12.0).

Simultaneous with the execution of the hauling agreement, CES executed a document entitled "Acceptance of Hauling Agreement and Right of First Refusal" wherein it "accepts and ratifies the subject hauling agreement and agrees to be bound by all terms and conditions contained therein, as the same may apply to CES." (CES Agreement ¶ 1). The equipment lease specifies that it should be governed by Illinois law; the hauling agreement and the document executed by CES do not contain a choice of law provision.

From February through August of 1989, KELI hauled a total of 58,472.69 yards of waste for NARI, for which NARI received a one-dollar-per-yard reduction in the hauling charge.[3] On August 25, 1989, the Illinois Environmental Protection Agency and the Illinois Attorney General closed the Centralia landfill.

After the agreements terminated, Triad made interest payments to Southwest Bank on the note in the amount of $1,811.44 and $4,606.11, in October and November of 1989 respectively. Triad also paid $5,171.84 in fees to sustain the letter of credit securing the note, $24,359.92 to repair the equipment and $9,572.91 to remove a lien. One of the CAT compactors was sold for $7,097.13 and the DJB Articulated 35 ton truck was sold for $9,784.18. Triad applied the proceeds of the sales to the principal of the note.

On November 30, 1989, Triad sold NARI and assumed NARI's obligations. The sale of NARI included three transfer trailers for which Triad applied $111,928.49 to the outstanding principal of the Southwest Bank note. Another piece of equipment was sold for Triad by Mining Supply and Equipment. Triad has never received these proceeds, however, because Mining Supply contends that it is entitled to the proceeds in compensation for unpaid storage charges and repairs. Moreover, Mining Supply has filed for Chapter 7 bankruptcy and Triad, as an unsecured creditor, does not expect to recover any portion of the proceeds.

As of April 1, 1992, the principal balance of the Southwest Bank loan was $344,-

---

2. The initial paragraph of section 12 reads as follows:

> Notwithstanding the provisions of this agreement, after the initial ninety (90) day period of this agreement, and upon ninety (90) day notice thereof, COLLECTOR may, at any time, terminate this Agreement upon reasonable proof to the other party that the taxes assessed upon the disposal of the Waste have increased one hundred percent (100%) or more in any preceding consecutive twelve (12) month period or have increased four hundred percent (400%) or more, (i.e., to $2.20 or more) over the duration of this Agreement.

(Hauling Agreement § 12.0).

3. Invoices provided by NARI indicate KELI hauled the following number of yards of waste for which NARI received a $1.00 per yard reduction in the hauling charge:

| | | |
|---|---|---|
| Feb. 89 | | 4,206.00 |
| Mar. 89 | | 8,600.00 |
| Apr. 89 | | 9,000.00 |
| Apr. 89 | (additional invoice) | 266.67 |
| May 89 | | 9,333.34 |
| June 89 | | 10,066.67 |
| July 89 | | 8,866.67 |
| Aug. 89 | | 8,133.34 |

391.99 and accrued interest equalled $89,-043.38.

On February 28, 1992, in response to defense counsel and defendants' requests, the Court allowed defendants' counsel to withdraw. At that time, defendants' counsel represented that defendants were advised that they must obtain new counsel. On other occasions, the Court also advised William Tab Schmidt, the president of KELI and CES, that defendants must retain the services of an attorney and that the Court would not continue the trial. Schmidt appeared at the trial without benefit of counsel. At the close of Triad's case, the Court allowed Schmidt an opportunity to address the Court. Schmidt acknowledged the accuracy and authenticity of the documents submitted by Triad and admitted liability to repay a portion of the advance but took issue with Triad's claim that defendants are obligated to assume the equipment loan.

## CONCLUSIONS OF LAW

The Court has diversity jurisdiction over this breach of contract action. *See* 28 U.S.C. § 1332.

At the time set for trial, KELI and CES appeared without benefit of counsel through their president, William Tab Schmidt. Inasmuch as the Court and defendants' former counsel fully apprised Schmidt that he must retain counsel, the Court will proceed to address the merits of this action. *See Eagle Assoc. v. Bank of Montreal,* 926 F.2d 1305, 1309 (2d Cir.1991) (district court did not err in entering default when defendant partnership did not appear with counsel as ordered); *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1427 (7th Cir.1985) (corporation may not grant itself continuance by manipulating matters so that it has no counsel), *cert. denied,* 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

■ Initially, the Court notes that Triad has not established liability on the part of CES. The document executed by CES provides that it agreed to be bound by the hauling agreement as those terms applied to it. (CES Agreement ¶ 1). All financial responsibilities in the hauling agreement pertain to KELI. CES merely agreed to perform in the manner necessary to effectuate the hauling agreement. Triad has not put forward any evidence indicating CES agreed to assume KELI's financial obligations under the hauling agreement nor that CES has breached any agreement.

■ As to KELI, Schmidt admitted and the hauling agreement requires repayment of a portion of the $100,000 advance. More particularly, the hauling agreement specifies that Triad is entitled to a "pro rata portion of the unutilized advance payment." (Hauling Agreement § 2.04). Triad argues that this provision requires KELI to pay Triad the difference between the $120,000 credit given in exchange for the $100,000 advance and the actual credit that Triad received from KELI during the existence of the hauling agreement. In a footnote, Triad alternatively calculates the repayment due it by multiplying $120,000 by the percentage of unused credit. The Court concludes, however, that neither interpretation accurately describes KELI's obligation. "Pro rata" refers to a proportion between two figures, in this instance, the unutilized credit and the amount of credit initially contemplated. This percentage when applied to the "advance payment" yields the "unutilized advance payment." [4] Hence, the hauling agreement requires KELI to repay $51,272.76 ($100,000 times 61,527.31 over 120,000).[5]

Schmidt does not contest KELI's obligations as required by the equipment lease with regard to the costs incurred by Triad in repairing the equipment and removing mechanics' liens. Accordingly, on Count

---

**4.** Although the contract states that the repayment figure equals a percentage of the "unutilized advance payment," the parties must have intended that KELI repay that percentage of the advance payment that would represent the unutilized advance payment.

**5.** The figure of 61,527.31 represents the unutilized credit, calculated as the difference between the anticipated credit of $120,000 and the actual credit received of $58,472.69.

III, the Court will award $33,932.05 to Triad from KELI.

■ The primary disagreement between Triad and KELI concerns whether section 12.0 of the hauling agreement, which would require KELI to assume the obligation to pay the unamortized principal balance of the purchase money loans on certain pieces of equipment, applies to a termination resulting from the closure of the landfill pursuant to state law. KELI contends that when the hauling agreement terminates under the circumstances of this case, section 4.0 specifies all of KELI's continuing responsibilities. Thus, according to KELI, "[s]ubject to the provisions of Section 2.04, this agreement ... terminate[d] without further obligation to either party." (Hauling Agreement § 4.0)

■ When interpreting a contract, the Court strives to ascertain, if possible from the instrument itself, the intention of the parties. *H.K. Porter Co. v. Wire Rope Corp.*, 367 F.2d 653, 660 (8th Cir.1966) (interpreting Missouri law).[6] The Court attempts to harmonize seeming contradictions, *Phillips v. Authorized Investors Group*, 625 S.W.2d 917, 921 (Mo.Ct.App. 1981), while avoiding interpretations that yield unreasonable results, particularly when it can create a more probable construction, *Jim Carlson Constr., Inc. v. Bailey*, 769 S.W.2d 480, 482 (Mo.Ct.App. 1989). If the contract's terms are clear and unambiguous, the Court will give the words of the contract effect without considering the intent of the parties, even if the parties' intent appears to vary from the written terms. *L & K Realty Co. v. R.W. Farmer Constr. Co.*, 633 S.W.2d 274, 278 (Mo.Ct.App.1982).

■ The Court may go beyond the document, however, and consider surrounding circumstances if the contract is ambiguous,

that is, reasonably susceptible to more than one construction, giving words of the contract their plain and ordinary meaning as understood by a reasonable, average person. *Speedie Food Mart, Inc. v. Taylor*, 809 S.W.2d 126, 129 (Mo.Ct.App.1991). The mere fact that the parties disagree, however, does not render the contract ambiguous. *Enyeart v. Shelter Mut. Ins. Co.*, 693 S.W.2d 120, 123 (Mo.Ct.App.1985).

The Court concludes that the parties intended that the provisions of section 12.0 would apply even if the landfill is closed by operation of law and that section 4.0's waiver of further obligations under the hauling agreement refers to the general import of the agreement, the specific details regarding the waste hauling. The terms of the hauling agreement demonstrate that Triad assumed substantial responsibility for the equipment. KELI's lease payments to Triad matched the loan payments due by Triad to the lending bank. Once paid for, NARI would transfer title to the equipment to KELI.[7]

■ Although the Court adopts Triad's position that section 12.0 is not preempted by section 4.0, the Court rejects Triad's interpretation of the requirement created in section 12.0. Triad contends that KELI must assume the entire unamortized principal on the debt incurred in purchasing all the equipment listed in exhibit A to the hauling agreement. Section 12.0, however, states that "[u]pon termination of this Agreement, HAULER shall assume COLLECTOR'S obligation to pay the unamortized principal balance of COLLECTOR'S purchase money loans, (including prepaid finance charges), plus the unamortized portion of all cash amounts invested directly, and associated with the DJB Articulated 35 ton truck, the Cat 816 Compactor operated at the landfill, and the Liebherr 641 Truck Loader, and COLLECTOR shall assign all

---

6. The equipment lease selects Illinois law to govern interpretation of that agreement. Although that agreement is incorporated by reference into the hauling agreement, it does not appear that the choice of law provision was intended to extend to the entire hauling agreement. No difference exists between the law of Missouri and Illinois as it relates to contract

interpretation, however, and therefore the Court need not resolve this issue.

7. To the extent the relationship between sections 4.0 and 12.0 is ambiguous, the evidence indicates the parties intended that the requirements of section 12.0 would apply even if the agreement terminated pursuant to section 4.0.

right to title to the foregoing assets to HAULER, and COLLECTOR shall provide HAULER with a warranty bill of sale to the foregoing assets, free and clear of all encumbrances except the loans assumed by HAULER."

Triad's interpretation would require the Court to conclude that the phrase "associated with the DJB Articulated 35 ton truck, the Cat 816 Compactor operated at the landfill, and the Liebherr 641 Truck Loader" only modifies the phrase "the unamortized portion of all cash amounts invested directly" and not the phrase "the unamortized principal balance of COLLECTOR'S purchase money loans." This interpretation, however, yields the unreasonable result that although KELI would pay for all equipment it would receive title to only three pieces. Moreover, the next paragraph states that "[u]pon HAULER'S election, HAULER may include the remaining assets described on Exhibit 'A' in this assumption of debt and conveyance of title, otherwise, these assets shall remain COLLECTOR'S property and the debt thereon shall be COLLECTOR'S obligation to satisfy." This paragraph implies that KELI did not automatically assume the debt incurred in procuring each item of equipment set forth in exhibit A. Moreover, Triad's interpretation does not flow naturally from the text because it ignores the fact that the phrase "plus the unamortized portion of all cash amounts invested directly" is parenthetical to the sentence. The Court concludes that section 12.0 is not ambiguous and when examining the section in its entirety, must be construed to mean that KELI agreed to assume responsibility for the three enumerated pieces of equipment. Therefore, despite any contrary interpretation the parties may have manifested since the agreement terminated, the Court is bound by the language of the agreement. *See L & K Realty Co. v. R.W. Farmer Constr. Co.*, 633 S.W.2d 274, 278 (Mo.Ct. App.1982).

With the information before it, however, the Court cannot calculate damages on this issue. Accordingly, Triad shall provide the necessary information to determine the portion of the unamortized principal attributable to the DJB Articulated 35 ton truck, the Cat 816 Compactor operated at the landfill, and the Liebherr 641 Truck Loader. In light of this opinion, Triad should also justify its request for the two interest payments made after the agreement terminated and the fees paid to sustain the letter of credit securing the note.

Inasmuch as defendants did not present any evidence, the Court finds for plaintiff on defendants' crossclaims for breach of contract and fraud.